In re STOCKBRIDGE FUNDING
CORP., Debtor.

STOCKSCHLAEDER & McDONALD,
ESQS., Paul F. Stockschlaeder, Mary
K. Stockschlaeder, Gilbert Spitzer and
Jerome Spitzer, Plaintiffs,

v.

David R. KITTAY, as Trustee for the
Estate of Debtor, and Irwin
Birnbaum, Defendants.

Bankruptcy No. 91 B 10069.
Adv. No. 91–5923A.

United States Bankruptcy Court,
S.D. New York.

Oct. 8, 1992.

H. Karasik of Sherman, Citron & Karasik, New York City, for Paul F. Stockschlaeder, Mary K. Stockschlaeder, Stockschlaeder & McDonald, Esqs., Gilbert Spitzer and Jerome Spitzer ("the Spitzers"), (collectively, "plaintiffs").

D. Kittay of David R. Kittay, P.C., New York City, for David R. Kittay as trustee for debtor ("trustee").

M. Foreman of Proskauer Rose Goetz & Mendelsohn, New York City, for Irwin Birnbaum ("Birnbaum").

## AMENDED MEMORANDUM OF DECISION OF MOTION FOR CONTEMPT AND VIOLATION OF STAY

FRANCIS G. CONRAD, Bankruptcy Judge.*

* Sitting by special designation.

The following Memorandum of Decision [1] addresses two issues within the above adversary proceeding, namely whether civil contempt sanctions should be levied against Plaintiffs and whether Plaintiffs intentionally recorded mortgage assignments in violation of the automatic stay. We hold in favor of Trustee on both issues.

Creditors of Stockbridge Funding Corporation ("Stockbridge") filed an involuntary petition against the Debtor on January 4, 1991. 11 U.S.C. § 101 et seq. On March 1, 1991, the case was converted to Chapter 11, and Mr. Kittay was appointed Chapter 11 Trustee. On June 18, 1991, Plaintiffs filed a petition for declaratory judgment concerning the validity, extent, and priority of liens on real property. Plaintiffs also request that we determine whether the relevant mortgages [2] are estate property under 11 U.S.C. § 541(d). In his answer to the complaint, Trustee alleged counterclaims and has now moved for civil contempt and sanctions. This Memorandum of Decision resolves only the legal and factual issues raised in Trustee's two counterclaims.

## FACTUAL BACKGROUND

Like a two-faced Janus, Stockbridge Funding Corporation practiced its mortgage banking trade in two vastly different worlds. On the one hand, as a purveyor in the legitimate secondary mortgage market, Stockbridge sold mortgages to institutional investors, including banks, savings and loans, and pension funds. When these sales were finalized, Stockbridge no longer serviced the mortgages, and had no further rights or responsibilities with respect to the mortgages or the investors. This aspect of Stockbridge's business is not at issue here.

On the other hand, certain Stockbridge employees were also engaged in fraud and bad business practices that ultimately led to the financial ruin of numerous small investors. Operating primarily in the Polish immigrant communities of New York and New Jersey, Stockbridge solicited investors with so-called guaranteed returns in the secondary mortgage market. In newspaper and television ads targeted at the Polish community, Stockbridge promised risk-free investments with each investor's funds secured by mortgage assignments. In reliance on these and other promises, individual investors tendered cash to Stockbridge. Most if not all of these investors were of modest sophistication.[3]

When an investor invested money in Stockbridge, the investor and Stockbridge entered into an Investor's Agreement. The Investor's Agreement provided that the investor would be assigned a mortgage that Stockbridge had obtained in lending money to a borrower. Each agreement provided that the investor would be assigned a mortgage that would be recorded at Stockbridge's expense. When an Investor's Agreement was entered into, Stockbridge retained all of the rights of ownership of the assigned mortgage. According to each agreement, the investor bore no risk of loss on the assigned mortgage, relying instead on the Stockbridge guarantee of their investment.

Like the promises of a western snake oil salesperson, however, the enticements were too good to be true. Many small investors received little if any return on their investment in Stockbridge. Only 14% of all investors were actually assigned

---

**1.** Our subject matter jurisdiction over this controversy arises under 28 U.S.C. § 1334(b) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core matter under 28 U.S.C. § 157(b)(2)(K) and (O). See also, our holding on page 804, infra. This Memorandum of Decision constitutes findings of fact and conclusions of law under F.R.Civ.P. 52, as made applicable to this proceeding by F.R.Bkrtcy.P. 7052.

**2.** The three mortgages relevant here are named the Franklin, Ramirez, and Leder mortgages.

**3.** Sophisticated investors, including institutional investors, were generally more fortunate than the typical individual investor. For whatever reason, Stockbridge invested institutional funds in the legitimate secondary mortgage market. Overassignment and, in many cases, nonassignment of mortgages occurred, to the best of our knowledge, only in Stockbridge's dealings with smaller investors.

mortgages that were eventually recorded. Moreover, a substantial number of these investors were assigned loans that were either in default or whose value did not secure each investor's initial cash contribution.

Unknown to the individual investor, Stockbridge in fact became a classic Ponzi scheme in which senior investors were paid their "guaranteed" return with money provided by new investors, rather than as a return on the prior investment.[4] Stockbridge managed to function and to pay interest as long as new investors provided cash and senior investors rolled-over interest income. When the number of new investors dwindled, Stockbridge was unable to pay senior investors their guaranteed returns. Without new money to pay old debts, Stockbridge's house of cards collapsed.[5]

Overwhelming evidence shows that Stockbridge did not comply with the vast majority of its contractual obligations to individual investors. Stockbridge did not maintain a separate trust account for investor funds but instead commingled investor funds for use as working capital.[6]

The relation between Stockbridge and the Spitzers was articulated in several agreements executed in 1990 and 1991. The Spitzers, like Stockbridge, were represented by Stockschlaeder & McDonald.[7] Under the Warehouse Agreement[8], the Spitzers provided a $300,000 revolving line of credit to Stockbridge.[9] This line of credit provided Stockbridge with interim financing until mortgage assignments could be sold to institutional investors. The agreement also provided that the Spitzers would receive assignments in three Stockbridge mortgages as security for their warehous-

4. The original Ponzi artist, Carlo Ponzi, created what The New York Times called "one of the most ambitious affinity schemes of the 20th Century." Beginning in the 1920s, Ponzi solicited fellow immigrants in the Boston area to invest their life savings in his financial scheme. Ponzi falsely told investors that their money was used to buy international postal coupons that were then resold for a 100% profit. Claiming that his methods exploited the excessive differences in currency exchange rates following World War I, Ponzi was able to attract many unwary investors. Unknown to the investors, however, Ponzi's financial method was not based on actual earnings but instead used incoming investors to pay the returns promised to senior investors.

Ponzi showed little regard for the best interests of his investors. Investors included his own family members, his parish priest, and players at the local boccie court. More than 20,000 investors from the Boston area gave a total of $10 million before the pool of new investors dried up. Most investors lost their life savings, and Ponzi was later prosecuted for criminal fraud. Following his prison term, Carlo Ponzi died penniless in Rio de Janeiro in 1949. See The New York Times, August 25, 1992, B1, B4 (article describes several modern day Ponzi schemes, including Stockbridge Funding Corp.). See also, Cunningham v. Brown, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924).

5. According to current estimates, individual investors lost an aggregate of $33 million following Stockbridge's demise. The founder of Stockbridge, Eugene R. Karczewski, and his son, Eugene F. Karczewski, both pled guilty to federal securities fraud, federal mail fraud, fed-

eral wire fraud, and federal bank fraud following a criminal investigation into Stockbridge practices. Eugene R. and Eugene F. Karczewski are currently serving five and three year sentences, respectively, for these various criminal charges.

6. In contrast, a legitimate mortgage servicer collects from the mortgagor and holds the funds in an account separate from other mortgagor funds. See, C. Edson & B. Jacobs, *Secondary Mortgage Market Guide* § 9.04[2] (Matthew Bender 1991) ("The servicer should maintain separate, federally insured bank accounts for the deposit of principal and interest payments and escrow funds").

7. This inherent conflict of interest adds weight to Trustee's contention that Stockschlaeder & McDonald, and to some extent the Spitzers, were involved in acts designed to conceal assets of the estate.

8. Lenders in the secondary mortgage market often "warehouse" mortgages. In a typical warehouse arrangement, a party lends against a large number of mortgages for a short period of time. Warehousing provides interim funding to the originator of the mortgage until the mortgage can find a permanent investor and is used to cover various other delays between origination and ultimate resale on the secondary mortgage market. See Krasnowiecki et al, The Kennedy Mortgage Co. Bankruptcy Case: New Light Shed on the Position of Mortgage Warehousing Banks, 56 *Am.Bankr.L.J.* 325, 328 (1982).

9. This amount was later amended to $400,000.

ing loan to Stockbridge.[10] According in the Warehouse Agreement, Stockbridge retained the right to repurchase the three mortgages. To further protect Spitzers' interest, Stockschlaeder & McDonald filed a financing statement in the New York County Registrar's Office and the New York Secretary of State's office.

Stockschlaeder & McDonald held the Spitzers' interests in the three mortgages under an escrow agreement. The agreement stated that the assignment of mortgages from Stockbridge to the Spitzers "shall be held in escrow by the Disbursement Account Administrator (Stockschlaeder & McDonald) until a mortgage loan is purchased by the Institutional investor which committed to purchase the said Mortgage Loan".[11] With full and complete knowledge of Stockbridge's bankruptcy, Stockschlaeder & McDonald released the assignments from escrow to the Spitzers directly, thereby defeating Stockbridge's right under the Warehouse Agreement to repurchase or sell the mortgages to another institutional investor.[12] In an attempt to protect their clients' interests, Stockschlaeder & McDonald then recorded the Spitzers' assignments in the real property records. Plaintiffs readily admit that the recordations occurred postpetition.

Trustee cites the following events in support of the counterclaim for contempt sanctions. On February 1, 1991, we signed an order to show cause why Stockschlaeder & McDonald should not turn over documents in the firm's possession relating to the debtor's business. On March 1, 1991, a hearing was held on the show cause order.

At the hearing on March 1, 1991, Trustee argued that he was legally entitled to discovery of the documents to the documents

in Stockschlaeder & McDonald's possession under 11 U.S.C. § 542(e) and that the documents were essential to the administration of the estate. We agreed. In open court, we ordered Stockschlaeder & McDonald immediately to turn over all files within its possession relating to Stockbridge's business to Trustee. Given Trustee's clear statutory authority to see and possess the documents, we stated that if the firm did not turn over to Trustee all such files in its possession by 6:00 P.M. on March 4, 1991, we would hold the firm in contempt of court. To further enforce our order and to eliminate all doubt as to our intentions, we stated for the record that we would order Stockschlaeder & McDonald to pay contempt sanctions of $10,000 for each day it did not comply. Although not articulated in the record, it was our clear understanding that failure to obtain the records would seriously impede Trustee's investigation of the case. The stated amount was to ensure obedience to our order.

On March 7, 1991, we issued a written order directing Stockschlaeder & McDonald to turn over the files. The last of the files in question were given to Trustee on April 14, 1992. Some 407 days after the first order, Stockschlaeder & McDonald turned over what appeared to be the remaining documents.

Stockschlaeder & McDonald offer several arguments why the documents were not turned over to Trustee. First, Stockschlaeder & McDonald argues that the March 7, 1992, order does not mention "turn over" expressly and instead only requires that Stockschlaeder and McDonald "grant access" to the files in issue. Stockschlaeder & McDonald therefore did not believe themselves obligated to deliver the files to

**10.** Plaintiffs claim they have an ownership interest in the mortgages rather than a security interest. The loan and security agreements, however, show that Plaintiffs had at most a security interest in the paper evidencing the note and mortgage. *See,* Discussion, *infra,* text following footnote 20.

**11.** Warehouse Agreement, Paragraph 5C.

**12.** Trustee alleges that the release of the collateral held in escrow by Stockschlaeder & McDonald violated the terms of the Warehouse

Agreement. The release allowed the Spitzers to take possession of the mortgage assignments and therefore claim a security interest under Article 9 of the Uniform Commercial Code. If the assignments had remained in escrow subject to the contingencies outlined in the Warehouse Agreement, the Spitzers could not have claimed legal title to the assignments under New York escrow agreement law. *See, In re Lasercad Reprographics, Ltd.,* 106 B.R. 793, 798–800 (Bkrtcy. S.D.N.Y.1989).

Trustee. Second, Stockschlaeder & McDonald contends that when this court ordered the firm to turn over the files, Stockschlaeder & McDonald was under the impression that the court meant only a limited number of litigation files, rather than all files within Stockschlaeder's possession that related to the business of the debtor. Third, the firm argues that Trustee should have conducted a Rule 2004 examination to obtain the information, rather than requesting documents within the Stockschlaeder & McDonald's possession. Stockschlaeder & McDonald also asserts that some documents were privileged as confidential communications between the firm and its clients, the Spitzers. For the reasons expressed below, we reject their arguments in their entirety.

## DISCUSSION

We are faced with two primary legal issues. The first issue is whether contempt sanctions should be levied against Stockschlaeder & McDonald for failure to comply with three court orders to turn over documents to the Trustee. Second, we are asked to determine whether Plaintiffs' postpetition recordations of mortgage assignments violated the automatic stay and whether Plaintiffs' actions warrant compensatory and punitive damages.

■ We first direct our attention to the contempt issue. Proceedings for contempt in bankruptcy cases fall in one of two categories: civil or criminal. Civil and criminal contempt differ according to the purpose and character of the sanctions imposed. *Shillitani v. United States*, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966). Civil contempt orders serve two purposes: (1) to compel or coerce obedience of a court order or (2) to compensate parties for losses resulting from the contemnor's noncompliance with a court order. *In re Haddad*, 68 B.R. 944, 952 (Bkrtcy.D.Mass.1987). Sanctions imposed

for civil contempt should not be punitive in nature. *Hicks v. Pearlstein (In re Magwood)*, 785 F.2d 1077 (D.C.Cir.1986); 8 *Collier on Bankruptcy*, ¶ 9020.03 (1991). As the term implies, criminal contempt punishes acts done with a willful, contumacious or reckless state of mind.[13] Criminal contempt "is a crime in the ordinary sense" and "convictions for criminal contempt are indistinguishable from ordinary criminal convictions ...". *In re Hipp, Inc.*, 895 F.2d 1503, 1509 (5th Cir.1990) (quoting *Bloom v. Illinois*, 391 U.S. 194, 201, 88 S.Ct. 1477, 1481–82, 20 L.Ed.2d 522 (1968)). The issue now before us concerns civil contempt only.

■ Like other courts, a bankruptcy court possesses the inherent power to enforce compliance with its lawful orders through civil contempt. The Supreme Court has stated:

> The power to punish for contempt is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice. The moment the courts of the United States were called into existence, and invested with jurisdiction over any subject, they became possessed of this power.

*In re L.H. & A. Realty, Inc.*, 62 B.R. 910 (Bkrtcy.D.Vt.1986), citing *Ex Parte Terry*, 128 U.S. 289, 295, 9 S.Ct. 77, 78, 32 L.Ed. 405 (1888), quoting *Ex Parte Bollman*, 8 U.S. (4 Cranch) 75, 94, 2 L.Ed. 554 (1807); Story, Const. sec. 1774, footnote (a); Bac. Abr. Courts, E. Numerous courts have held that recourse to civil contempt may be necessary and appropriate to implement provisions of the Bankruptcy Code. *In re Damon*, 40 B.R. 367 (S.D.N.Y.1984); *In re L.H. & A Realty, supra; Kimco Leasing,*

---

13. Whether a bankruptcy court has the authority to punish for criminal contempt has not been resolved in the Second Circuit. Other courts have held that a bankruptcy court lacks the power to punish for criminal contempt. *See, In re Hipp, Inc.*, 895 F.2d 1503, 1509. The district court may, however, "punish for criminal contempt a violation of an order of the bankruptcy court where the bankruptcy court is a unit of the district Court imposing the punishment." *U.S. v. Guariglia*, 962 F.2d 160 (2nd Cir.1992).

*Inc. v. Knee*, 144 B.R. 1001 (N.D.Ind.1992) (and cases cited therein).

 Subject to the control and review of the district court, a bankruptcy court can exercise its power of civil contempt in a core proceeding and issue final contempt orders. *In re L.H. & A. Realty, Inc.*, *supra*, 62 B.R. at 911–12. Civil contempt proceedings arising out of core matters are themselves core matters. *In re Skinner*, 917 F.2d 444, 448 (10th Cir.1990) (citations omitted). We therefore hold that Trustee's counterclaim for contempt is a core matter because Plaintiffs' adversary proceeding is a core matter.

A bankruptcy court's contempt power is recognized by statute, 11 U.S.C. § 105(a), by rule, Bankruptcy Rule 9020, and has been acknowledged or simply assumed to subsist in various non-Article III tribunals.[14] In Title 11 U.S.C. § 105(a), Congress invested bankruptcy courts with the power to enforce their own orders. Section 105(a) provides in relevant part that a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Although a conflict exists among the Circuit Courts of Appeal, most courts hold that § 105(a) empowers bankruptcy courts to order sanctions for civil contempt.[15] *See, In re Power Recovery Systems, Inc.*, 950 F.2d 798 (1st Cir.1991); *In re Skinner*, 917 F.2d 444 (10th Cir. 1990); *In re Walters*, 868 F.2d 665 (4th Cir.1989); *contra, In re Sequoia Auto Brokers, Ltd., Inc.*, 827 F.2d 1281, (9th Cir.1987).[16]

Federal Rule of Bankruptcy Procedure 9020 also recognizes Congress's intent to invest civil contempt power in bankruptcy courts. Rule 9020(a) provides, in pertinent part, that "contempt committed in the presence of a bankruptcy judge may be determined summarily by a bankruptcy judge." In addition, subsection (b) states that a bankruptcy court may issue an order of contempt if proper notice and a hearing is provided. *See, In re Power Recovery Systems, Inc.*, 950 F.2d 798 (1st Cir.1991).

 Where the purpose of a monetary sanction is to make a party comply with a court order the court has wide discretion in considering the character and magnitude of the harm threatened by the continued contumacy, as well as the probable effectiveness of bringing about compliance. *In re Power Recovery Systems, Inc.*, *supra*, 950 F.2d at 802. Similarly, monetary sanctions imposed to coerce future compliance with a court order are not punitive because they do not relate to past behavior. In cases where a court threatens to impose sanctions for continued noncompliance, the party can avoid the sanction by making all reasonable efforts to comply with the order. *Pesaplastic, C.A. v. Cincinnati Milacron Co.*, 799 F.2d 1510 (11th Cir.1986); *United States v. Rizzo*, 539 F.2d 458 (5th Cir.1976). The self-induced inability to comply is not a valid defense.

**14.** Federal courts have acknowledged that various courts and tribunals not created under Article III, including the Tax Court, Claims Court, Court of Military Appeals, and administrative agencies are invested with the power to enforce their orders through civil contempt. *See In re L.H. & A. Realty, Inc.*, *supra*, 62 B.R. at 913.

**15.** In *In re Walters*, the Fourth Circuit addressed the issue of the bankruptcy court's authority, as an Article I court, to effect its orders and carry out its judicial functions. The court held that 11 U.S.C. Section 105(a) authorizes the bankruptcy court's use of the civil contempt power, and that the exercise of that power does not violate the separation of powers concern articulated in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). The court wrote:

> If Congress can constitutionally create legal presumptions, assign burdens of proof and prescribe legal remedies for Article I courts, it seems to follow that it can constitutionally grant them the power to enforce their own orders through civil contempt.

*In re Walters*, 868 F.2d 665 (4th Cir.1989). *See, In re Miller*, 81 B.R. 669 (Bkrtcy.M.D.Fla.1988). See also, Parkinson, The Contempt Power of the Bankruptcy Court, Fact or Fiction: The Debate Continues, 65 *Am.Bankr.L.J.* 591 (Summer 1991).

**16.** We note that the Ninth Circuit's opinion was rendered before the effective date of the 1987 Amendments to Federal Rule of Bankruptcy 9020.

■ The two requirements for civil contempt in this District were set forth in *In re Damon, supra.* The contemnor must have knowledge of a specific, precise order, and the contemnor must knowingly violate that order. Willfulness is not required. Indeed, intent is irrelevant because of the remedial and coercive nature of civil contempt. *Id.* at 374 (citations omitted).

■ We agree with Trustee that the facts as shown warrant the issuance of contempt sanctions. Given our repeated orders directing Stockschlaeder to turn over the files, there is no doubt that there was a knowing violation of this court's specific orders. Moreover, we characterize Plaintiffs' conduct as an intentional, if not malicious, violation of a court order.

Plaintiffs' argument that they made a good faith effort to comply with our turnover orders is completely without basis. Trustee served Stockschlaeder & McDonald with the February 1, 1991, Order to Show Cause and the March 7, 1991, Order, both of which ordered all of Debtor's former attorneys, including Stockschlaeder & McDonald, to turn over to Trustee all files in their possession relating to the business of the Debtor. Furthermore, an associate of Stockschlaeder & McDonald, Richard Sules, represented the firm at the March 1, 1991, hearing when we orally ordered from the bench Stockschlaeder & McDonald to turn over the files by March 4, 1991, or face sanctions in the amount of $10,000 per day. We also asked Mr. Sules if he understood the order, and he replied in the affirmative.

Plaintiffs' contention that our turnover orders were limited to certain litigation files is also without merit. Our turnover orders encompassed all the files that Stockschlaeder & McDonald possessed regarding Stockbridge's business. We did not limit our order to certain litigation files, nor did we order turnover of documents concerning the firm's confidential communications with the Spitzers. In short, none of the reasons expressed in the Plaintiff's papers can explain their failure to turn over the documents to Trustee.

Given the number and clarity of our orders, this is not an ambiguous case to be construed in favor of the alleged contemnor.[17] Our March 7, 1991, Order provided that "all Debtor's present and former attorneys, accountants, officers, and employees shall grant the Trustee and his agents access to all documents and files related to the business of the Debtor." This order was issued in the context of our earlier order in open court that turnover, i.e., delivery of the documents to Trustee, was required.

Plaintiffs' assertion that "grant ... access" meant only a passive obligation on behalf of the firm to disclose files is meritless in light of the totality of circumstances surrounding this matter. Turnover language was first used because Stockschlaeder & McDonald systematically frustrated Trustee's discovery attempts. Documents were concealed. Dates and signatures were altered. To avoid a senseless hide-and-seek game at the expense of the debtor's estate, we ordered Stockschlaeder at the March 1, 1991, hearing to turn over all documents relating to Debtor's business to Trustee. We used the words "turn over" to mean that Plaintiffs were required to "deliver" or "surrender" the documents to Trustee.[18]

Indeed, Stockschlaeder & McDonald made this same argument that only a limited form of "access" was required in its response to Trustee's Order to Show Cause dated February 1, 1991. During the Order to Show Cause Hearing on March 1, 1991, we ordered Stockschlaeder & McDonald to turn over the files. We rejected the argument then that only the firm's illogical concept of "disclosure" was required. After Stockschlaeder & McDonald's continued efforts to frustrate discovery, we see no reason to change our opinion now.

Assuming, *arguendo*, that our March 7, 1991, order provided only "access" as de-

---

**17.** The principles found in *Ford v. Kammerer,* 450 F.2d 279, 280 (3rd Cir.1971) and *Frankford Trust v. Allanoff,* 29 B.R. 407, 410 (D.C.E.D.Pa. 1983) are not applicable here.

**18.** The quotations are taken from Webster's Ninth New Collegiate Dictionary, page 1274.

fined by the Plaintiffs, we still see no merit in Plaintiff's position. On February 25, 1992, almost one year after the March 7, 1991 turnover order, Trustee learned following a visit to Stockschlaeder & McDonald's offices that Plaintiffs had withheld approximately fifty Stockbridge files. This discovery did not arise from the firm's voluntary disclosure; Trustee was able to review the files only after threatening court action. Plaintiffs therefore failed to meet even the minimum requirement: disclosure of the files at Stockschlaeder & McDonald's place of business. Clearly, Plaintiffs cannot reasonably argue that active concealment constitutes "access."

On March 10, 1992, Trustee sent Plaintiffs a letter requesting all the remaining files in Stockschlaeder & McDonald's possession. From a reply letter, Trustee learned that more previously undisclosed Stockbridge files existed. Additional files, including those specifically related to the Warehouse Agreement and Trustee's counterclaims, were not disclosed until April 14, 1992, or 407 days after our original order.

█ Plaintiff's argument that Trustee should have sought the documents through a Rule 2004 discovery request is similarly unpersuasive. The issue here is the knowing violation of a court order, not the best means to facilitate the dissemination of information. In light of the Plaintiffs' repeated efforts to frustrate Trustee's statutory authority to gather information, we decline Plaintiffs' invitation to second-guess Trustee's best judgment.[19]

We are at a loss to understand why, given our clear and unequivocal orders to turn over the files, the firm did not search every inch of its offices for files relating to Stockbridge's business and turn over whatever was found to Trustee. Stockschlaeder & McDonald held within their power the

ability to avoid the contempt sanctions but chose to ignore our orders. Here, as in other contempt cases, "the contemnor carries the keys of his prison in his own pocket." *Penfield Company of California v. Securities & Exchange Commission*, 330 U.S. 585, 590, 67 S.Ct. 918, 921, 91 L.Ed. 1117 (1947).

Finally, there can be no doubt that turnover of the documents to Trustee was our intent and order. To require anything less of Stockschlaeder & McDonald would belittle the authority and dignity of this court, the responsibility of attorneys as officers of this court, and Trustee's statutory duty to collect and oversee the fair distribution of estate assets to creditors. It is as much a matter of common sense as of common law that an order signifies compulsion. The remedy for an order a party may believe is wrong is an appeal, not disobedience. In the alternative, Stockschlaeder & McDonald should have commenced a declaratory action, or asked us to reconsider our order. None of this was done.

█ Under the circumstances of this case, we are confident that the standard dictated in *In re Damon* has been satisfied, and we find Stockschlaeder & McDonald in contempt. We grant Trustee's motion for contempt sanctions in the amount of $4,070,000.00.[20] We also grant Trustee's request for attorneys' fees in the amount of $5000. A hearing will be set to determine any appropriate compensatory and punitive damages.

We next turn our attention to Trustee's second issue, namely whether Plaintiffs' recordation of several mortgage assignments postpetition constitutes a violation of the automatic stay. It is fundamental that the § 362 automatic stay protects both debtor and creditor by preventing a race to

---

**19.** At an earlier hearing, we addressed Plaintiffs' concerns regarding the possible attorney-client privilege issues. We agreed to exclude from Trustee's review certain documents representing confidential communications between the Spitzers and Stockschlaeder & McDonald because Stockschlaeder & McDonald represented both the Spitzers and Stockbridge. Similar procedures could have been used to quell any of the Plaintiffs' subsequent concerns. Instead, Plain-

tiffs chose to conceal relevant documents in violation of three court orders.

**20.** This amount reflects our order that the Plaintiffs be assessed sanctions of $10,000 per day until they turned over to Trustee all documents relating to the debtor. The documents were turned over to Trustee after 407 days.

the courthouse for the assets of the debtor. The stay gives the debtor a respite and ensures that similarly situated creditors share equally in the orderly liquidation of the debtor's assets.

In its application to this case, the stay prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3); *See, In re Brooks*, 871 F.2d 89 (9th Cir.1989) (recording deed of trust post-petition violates automatic stay); and *In re Sapp*, 91 B.R. 520 (Bkrtcy.E.D.Mo.1988) (recording deed postpetition violates automatic stay). The automatic stay prohibits the initiation of any steps, such as an attempt to record an interest in real property, that could lead to foreclosure of property of the debtor's estate. *In re Manville Forest Products Corp.*, 43 B.R. 293, 298 (Bkrtcy.S.D.N.Y.1984), citing *In re Capital Mortgage & Loan*, 35 B.R. 967, 971 (Bkrtcy.E.D.Cal.1983).

In Trustee's counterclaim, it is alleged that Stockschlaeder & McDonald, as attorneys for both Stockbridge and the Spitzers, attempted to conceal from Trustee a series of actions that violated the stay. First, Trustee states that Stockschlaeder & McDonald wrongfully released from escrow several mortgage assignments that secured the Spitzers warehousing loan to Stockbridge. Second, following the wrongful release, Trustee alleges that Stockschlaeder & McDonald, with full knowledge of Stockbridge's bankruptcy, recorded the mortgages in the real property records to perfect their interests in the properties. These overt acts, according to Trustee, improved the Plaintiffs' interest in the assignments in violation of the stay. Trustee concludes that Plaintiffs' conduct was part of a comprehensive fraud designed to benefit certain Stockbridge insiders at the expense of other investors.

In their response papers, Plaintiffs argue that their interests in the mortgages were perfected prepetition when the Spitzers, via an escrow agreement with Stockschlaeder & McDonald, took possession of the assignments. Plaintiffs concede that the recordations occurred postpetition, but argue that recording the assignments did not improve their position as a secured creditor. In sum, Plaintiffs contend that they were already a secured party before they recorded the assignments and that they are entitled to foreclose on the three mortgages. To analyze each party's arguments, we must first determine the effects, if any, of recording a mortgage assignment in the real property records.[21]

We begin our analysis of Plaintiffs' argument with a brief summary of state law. As a general rule, a secured real property transaction consists of two documents: the mortgage document and the note or bond. On one hand, the mortgage document creates a security interest in the real property. On the other, the note or bond evidences the debt that is secured by a mortgage.

The parties to these transactions, i.e., the mortgagee and mortgagor, reside in different legal worlds. Those dealing with the mortgagee essentially deal with personal property, such as the right to receive payments under a typical assignment or when the mortgagee sells the note and mortgage outright or pledges both as security for a loan. These rights to payment are determined under U.C.C. Article 9.[22] The inter-

**21.** As a preliminary matter, Plaintiffs' claim that 11 U.S.C. § 541(d) takes the relevant mortgage assignments out of the bankruptcy estate and that the automatic stay is therefore inapplicable. We disagree. Section 541(d) of the Bankruptcy Code exempts secondary mortgage market participants from compliance with state recording laws regarding perfection of the interests of assignment purchasers. *In re Lemons & Associates, Inc.*, 67 B.R. 198, 215 (Bkrtcy.D.Nev.1986); *See*, 124 Cong.Rec. S.17, 413 (Oct. 16, 1978). The existence of fraud or bad business practices by a debtor, however, eliminates the protections provided to the secondary mortgage market in § 541(d). *In re Fidelity Standard Mortgage Corp.*, 36 B.R. 496, 500 (Bkrtcy.S.D.Fla.1983). Given the high degree of fraudulent conduct involved in the present case, § 541(d) clearly does not apply here.

**22.** Subsection 3 of 9–102 states that "The application of this Article to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this Article does not apply." Official Comment 4 of 9–102 provides

ests of the mortgagee are evidenced by the note and the mortgage.

In contrast, the mortgagor's interest in the land is a real property interest, i.e., in the land itself. Those dealing with the mortgagor should, in order to comply with state recording statutes, record in the real estate records to perfect their interest in the property. Filing in the real property records provides notice to subsequent good faith purchasers and to those dealing with the mortgagor of any security interests in the land itself. *See* White & Summers, *Uniform Commercial Code*, § 21-7 (3rd Ed.1988).[23]

■ In New York, the collateral assignment of a secured note, including a mortgage note, creates a security interest in the note. *Federal Deposit Insurance Corp. v. Forte*, 463 N.Y.S.2d 844, 94 A.D.2d 59 (1983). Under U.C.C. 9-102(3), Article 9 governs perfection of a security interest in a note.[24] To perfect an interest in a mortgage assignment, the assignee must take

possession of the note. *Landmark Land Co., Inc. v. Sprague*, 529 F.Supp. 971 (S.D.N.Y.1981), *rev'd on other grounds*, 701 F.2d 1065 (2d Cir.1983); *See In re Kennedy Mortgage Co.*, 17 B.R. 957 (Bkrtcy.D.N.J.1982). Courts have uniformly held that possession of the note puts everyone who deals with a record mortgagee on notice of the outstanding claim. *Kellogg v. Smith*, 26 N.Y. 18 (1862); *Syracuse Savings Bank v. Merrick*, 182 N.Y. 387, 75 N.E. 232 (1905).

■ Aside from possession of the note representing the underlying obligation, the issue remains concerning whether an assignee must also record the assignment of the real estate mortgage to perfect his interest in the underlying obligation.[25] According to a growing consensus, possession of the note perfects the right to payment, regardless of what actions are taken by the payee with respect to recording the mortgage.[26] U.C.C §§ 9-102(3) Official Com-

---

the following illustration of subsection (3): "The owner of Blackacre borrows $10,000 from his neighbor, and secures his note by a mortgage on Blackacre. This Article is not applicable to the creation of the real estate mortgage. Nor is it applicable to a sale of the note by the mortgagee, even though the mortgage continues to secure the note. However, when the mortgagee pledges the note to secure his own obligation to X, this Article applies to the security interest thus created, which is a security in an instrument even though the instrument is secured by a real estate mortgage. This Article leaves to other law the question of the effect on rights under the mortgage of delivery or non-delivery of the mortgage or of recording or non-recording of an assignment of the mortgagee's interest. See § 9-104(j) ..."

Article 9 § 104 lists transactions excluded from Article 9. Subsection (j) of 104 states that "This Article does not apply to ... to the creation or transfer of an interest in or lien on real property ..." Although 104(j) appears to contradict Official Comment 4 of 9-102(3), *supra*, courts and commentators have concluded that 104(j) severs treatment of an obligation to pay (governed by Article 9) from treatment of the property which secures that obligation (governed by state property law). *In re Equitable Dev. Corp.*, 20 U.C.C.Rptr.Serv. 1349 (S.D.Fla. 1976); and *Bender's U.C.C. Service*, § 5A.18[2], 5A-98 (1979).

23. According to at least one learned commentator, the vast secondary market that exists for

mortgage paper (mortgages and notes) operates independently of the transactions that occur in the real estate itself. Because mortgages were classified as personalty in the common law, early cases held that recording acts did not apply to mortgage assignments. Although this remains the law in some jurisdictions, a number of states have enacted recording acts applicable to mortgage assignments. This blurring of the respective mortgagee and mortgagor interests has created confusion among secondary mortgage bankers and brokers. *See* Kransnowiecki, Miller & Ziff, The Kennedy Mortgage Co. Bankruptcy Case: New Light Shed on the Position of Mortgage Warehousing Banks, 56 *Am.Bankr.L.J.* 325, 334.

24. See note 21, *supra*.

25. The term "perfect" is most properly used when discussing security interests in personal property, since it is a term of art associated with the Uniform Commercial Code. In this opinion, however, we sometimes apply the term to what an entity must do, in addition to receiving a grant of the interest, to assure that its interest in the property, whether realty or personalty, is superior to any other grant of an interest which was not perfected at the time the entity perfected its interest. *See In re Willmar Nursing Home*, 1991 WL 172017 (Bkrtcy.D.Minn.1991) (citation not reported in B.R.).

26. Possession is not defined in the Uniform Commercial Code. The Code Comment states

ment 4, 9–304(1), 9–305; *In re Wittenburg*, 113 B.R. 66 (Bkrtcy.M.D.Fla.1990); *In re Isbell*, 27 B.R. 926 (W.D.Wis.1983). The assignee need not take any action with respect to the mortgage because the "mortgage without the debt is of no effect," or, in other words, the mortgage follows the note. *In re Kennedy Mortgage*, 17 B.R. at 965. Therefore, the assignee is not required to file the assignment in the real estate records nor take any action with respect to the mortgage to perfect. *See In re Kennedy Mortgage Co., supra;* White & Summers, *Uniform Commercial Code*, § 23–7, (3rd Ed.1988); and Kransnowiecki, Miller & Ziff, The Kennedy Mortgage Co. Bankruptcy Case: New Light Shed on the Position of Mortgage Warehousing Banks, 56 *Am.Bankr.L.J.* 325, 334.

As a basis for the counterclaim alleging violation of the automatic stay, Trustee argues that recording the assignments perfected the Plaintiffs' interests in the three mortgages. According to Trustee, to record is to perfect. Pre–Uniform Commercial Code cases support this position, including the following examples. First, a recorded assignment of a mortgage is constructive notice of the rights of the assignee as against any act of the mortgagee affecting the mortgage assigned. *Chittick v. Thompson Hill Development Corp.*, 230 A.D. 410, 245 N.Y.S. 71 (1930), *aff'd* 259 N.Y. 223, 181 N.E. 458 (1932). Second, recording furnishes protection against a subsequent assignment of the same mortgage. *Goettlicher v. Wille*, 76 Misc. 361, 134 N.Y.S. 977, *aff'd* 156 A.D. 392, 141 N.Y.S. 1121 (1912). Third, a recorded assignment grants the assignee priority over a prior unrecorded conveyance. *Westbrook v. Gleason*, 79 N.Y. 23 (1879); *See*, 78 *N.Y.Jur.2d*, Mortgages and Deeds of Trust § 261 (1989).[27]

Trustee also cites New York Real Property Law § 291 in support of his argument that recording the mortgage assignments improved Plaintiffs' rights to the three properties. In sum, § 291 provides that an unrecorded conveyance is void as against a subsequent conveyance that is recorded first. Based on our earlier analysis regarding perfection of mortgage assignments under Article 9, we find that § 291 does not apply when the mortgagee assigns his rights to realty paper. Trustee's conclusion that "to record is to perfect" is therefore incorrect under the facts of this case.

Trustee also argues that New York Real Property § 324 provides that an assignment of a mortgage must be recorded in order that payment by the borrower to the mortgagee or prior assignee be invalidated. Trustee concludes that Plaintiffs improved their position when they recorded the assignments in the real property records. Trustee's conclusion, however, misstates the purpose of the statute. New York Real Property Law § 324 (McKinney 1989) provides:

> The recording of an assignment of a mortgage is not in itself a notice of such assignment to a mortgagor, his heirs, or personal representatives, or to an owner of the mortgaged premises where such assignment is recorded subsequent to the recording of the conveyance of such premises to such owner, so as to invalidate a payment made by either of them to the mortgagee or a prior assignee of the mortgage.

From our reading of the statute, § 324 is designed to protect the mortgagor from being liable on a recorded mortgage assignment after mortgagor has already paid the mortgagee. Section 324 implicitly requires that the assignee provide some form of notice to the mortgagor other than recording in the real property records. The stat-

---

only that possession may be by the secured party himself or by an agent on his behalf and that the debtor or a person controlled by him cannot qualify as such an agent for the secured party. Delivery of possession to an escrow agent satisfies the perfection requirements of U.C.C. 9–305. *See In re O.P.M. Leasing Services, Inc.* 46 B.R. 661 (Bkrtcy.S.D.N.Y.1985) and *In re Nichols*, 88 B.R. 871 (Bkrtcy.C.D.Ill.1988).

**27.** Under New York law, the assignee of the mortgage and note may foreclose on the property, regardless of whether the mortgage assignment has been recorded. 78 N.Y.Jur.2d, Mortgages and Deeds of Trust § 531 (1989); *Fryer v. Rockefeller*, 63 NY 268 (1875). The recordation of the three mortgage assignments to the Spitzers therefore did not affect their right to foreclose.

ute has little relevance in the present dispute because § 324 has no bearing in perfecting an assignee's interest in the right to payment under a mortgage note.

■ Although Trustee cites valid law relative to general recording requirements, we conclude that the perfection of a security interest in a note is governed exclusively by Article 9, regardless of whether any mortgage securing the note has been properly recorded. It is an established tenet in real property law that whoever has priority to the obligation has priority to the underlying mortgage. One follows the other. Thus, in the absence of a statute expressly requiring delivery of the mortgage to the assignee or recordation of a mortgage assignment, we conclude that perfection and priority of a security interest in the note (by taking possession under Article 9) should carry over to the mortgage incidental to it. *See In re Willmar Nursing Home,* 1991 WL 172017 (Bkrtcy.D.Minn. 1991) (citation not reported in B.R.), citing B. Clark, The Law of Secured Transactions under the Uniform Commercial Code, 1.08[10][a], 1–113, n. 372 (2d ed.1988) (citations omitted).

Although our conclusion that possession of the note perfects the collateral assignment of a mortgage is well grounded in caselaw [28], we note that several courts have stated contrary views. In *Federal Deposit Ins. Corp. v. Forte,* 94 A.D.2d 59, 463 N.Y.S.2d 844 (2d Dep't 1983), the Appellate Division for the Second Department stated that

> [T]he collateral assignment of a secured note, including a mortgage note, creates a security interest in the note. We recognize that the cases are divided as to whether the Uniform Commercial Code applies to a pledge of realty paper as collateral. We are of the opinion that, according to the plain meaning subdivision (3) of section 9–102 and Official Comment 4 to section 9–102 of the Uniform Commercial Code the proper view is that Article 9 of the Code should "apply to all facets of transactions using mortgages and notes as collateral except those issue that arise when the mortgagee's creditor is attempting to enforce the mortgagee's rights under the mortgage".

*Id.,* 94 A.D.2d at 65, 463 N.Y.S.2d at 849 (citations omitted). From our reading of the above quote, *Forte* states that a creditor (or investor as is the case here) must have both possession and recordation of the assignment to have a perfected interest.

*Forte* cites *Landmark Land Company, Inc. v. Sprague,* 529 F.Supp. 971 (S.D.N.Y. 1981), *rev'd on other grounds,* 701 F.2d 1065 (2nd Cir.1983), in support of its conclusion regarding the requirements to perfect a mortgage assignment. In *Landmark Land,* the District Court held that Article 9 governs the collateral assignment of a real property interest securing a note as well as the collateral assignment of the note itself.

■ The conclusions in *Forte* and *Landmark Land,* however, confuse real property law with the U.C.C. We do not agree with the holding in *Landmark Land* that Article 9 applies to both notes and mortgages.[29] Real property law does not require a recording of an assignment of the mortgage to perfect a security interest in the mortgage, so long as the secured party takes a written assignment of the mortgage and takes and maintains possession of the note. Simply put, we believe that real property law should govern the mortgage, while possession of the note determines who has a security interest.

Our decision relative to this perfection issue is based on one prevailing policy, namely the feasibility requirements of the secondary mortgage market. In today's banking industry, most originating lenders assign their interests to institutional investors in the secondary mortgage market soon after the obligation is created. This

---

**28.** *See, In re Staff Mortgage & Investment Corp. (Greiner v. Wilke),* 625 F.2d 281 (9th Cir.1980); *In re Staff Mortgage & Investment Corp. (Huffman v. Wikle),* 550 F.2d 1228 (9th Cir.1977); *In re Kennedy Mortgage, supra.*

**29.** We are not bound by stare decisis to follow Judge Gagliardi's opinion because it emanates from a single district judge in a multi-judge district. *In re Argo Communications Corp.,* 134 B.R. 776 (Bkrtcy.S.D.N.Y.1991).

practice reflects the fact that most originating lenders have insufficient assets to hold the note until maturity. If we were to require assignees to record the mortgage assignment rather than simply possessing the note, mortgage paper would likely become unduly expensive. With fewer buyers in the secondary market, originating lenders would be less likely to lend in the first place. Such a result would ultimately dampen the public policy in favor of home ownership.[30]

■ Our conclusion that possession of the note perfects the assignee's security interest does not, however, benefit the Plaintiffs with respect to Trustee's counterclaim for violation of the stay. We agree with Trustee that Plaintiffs recorded the assignments to improve their status as a claimant under the three mortgaged properties. These postpetition recordations took place in the context of unsettled law regarding what acts were necessary to perfect collateral mortgage assignments. By recording the mortgages and taking possession of the notes, the Plaintiffs covered all the bases necessary to perfect, regardless of what legal theory was adopted by this court. Moreover, Plaintiffs labored to conceal the assignment recordations from Trustee so that their security interests would be unaffected by the Stockbridge bankruptcy.[31] These acts amount to a clear violation of the stay.

Plaintiffs' contention that they recorded the mortgage assignments without the intention to improve their interests is obviously without merit. As attorneys, Stockschlaeder & McDonald knew that recording could improve their standing with respect to other creditors. We thus cannot accept Plaintiffs' argument that the recordings were somehow inadvertent or meaningless. Similarly, the fact that Stockschlaeder & McDonald concealed the mortgage assignments from Trustee for over a year implies that the Plaintiffs were hiding what they

believed to be a validly perfected interest. We therefore hold that Plaintiffs' recordation of the mortgage assignments, although ineffectual in improving the party's legal rights under applicable state law, nevertheless violated the stay.

■ Trustee also argues that Plaintiffs violated the stay when they released the assignments from escrow in favor of the Spitzers. This release did not comply with any of the triggering events described in the escrow agreement, nor did Stockschlaeder & McDonald inform Trustee of the transfer. Trustee cites New York law for his conclusion that title and possession of property placed in escrow remains with the grantor until the occurrence of the conditions specified in the escrow agreement.

An interest held in escrow is defined in New York as

> [a] scroll, writing, deed, money, stock or other property delivered by the grantor, promisor, or obligor into the hands of a third person, to be held by the latter until the happening of a contingency or performance of a condition and then by him delivered to the grantee, promisee, or obligee.

*In re Pan Trading*, 125 B.R. 869 (Bkrtcy. S.D.N.Y.1991); *In re Lasercard Reprographics, Ltd.*, 106 B.R. 793 (Bkrtcy. S.D.N.Y.1989) (quoting Black's Law Dictionary, 5th ed., 1979 at 489). We summarized the three essential elements of an escrow under New York law in the following manner:

> 1. For an escrow to be valid, the delivery of the property must be irrevocable. Although the grantor retains a contingent right to repossess the property if the specified condition does not occur, while the property is in the hands of the depository it must be beyond the possession and control of the grantor ...; and,

---

**30.** For a general discussion of the secondary mortgage market and its history, see Krasnowiecki, Miller & Ziff, The Kennedy Mortgage Co. Bankruptcy Case: New Light Shed on the Position of Warehousing Banks, *supra*, 56 *Am. Bankr.L.J.* at 326–329.

**31.** Plaintiffs concealed one of the three mortgages assignments at issue here, the Leder Mortgage, until the date of the trial. We agree with Trustee that additional mortgage assignments may still remain hidden.

2. Under New York law, legal title to the property placed in escrow remains with the grantor until the occurrence of the condition specified ...; and,

3. [T]he deposit of property in escrow creates in the grantee such an equitable interest in the property that upon full performance of the conditions [of the] ... escrow ..., title will vest at once in him.

*Cohen v. Drexel Burnham Lambert Group, Inc.*, 138 B.R. 687 (Bkrtcy.S.D.N.Y. 1992), *quoting, In re O.P.M. Leasing Services, Inc.*, 46 B.R. 661, 667 (Bkrtcy. S.D.N.Y.1985).

Based on documentary and testimonial evidence, we believe that Plaintiffs released escrow property prior to the occurrence of any of the conditions described in the agreements. The release deprived Stockbridge of its right to sell the assignments to institutional investors, as well as any other benefit that Stockbridge could gain from its interest in the realty paper. We find that the release of the assignments violated the automatic stay because Plaintiffs' actions disturbed the status quo that existed prepetition. We therefore conclude that Plaintiffs violated the stay when they prematurely released escrow property and recorded their interests postpetition.

 Finally, Trustee requests compensatory and punitive damages under § 362(h) arising from Plaintiff's willful violation of the automatic stay. While we agree with Trustee that Plaintiffs willfully violated the stay when they recorded the mortgage assignment with full knowledge

of the bankruptcy, the prevailing theory of statutory construction prohibits this court from granting Trustee's request for damages.[32]

Sanctions for willful violations of the stay are allowed under 11 U.S.C. § 362(h). Subsection (h) provides

An *individual* injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. § 362(h) (emphasis ours).[33] Although § 362 generally applies to all debtors, the Second Circuit has held that subsection (h) benefits only individual (i.e., natural person) debtors. *In re Chateaugay Corp.*, 920 F.2d 183, 184 (2nd Cir.1990). A corporate debtor like Stockbridge therefore cannot receive sanctions under § 362(h).

The Second Circuit's conclusion that § 362(h) does not apply to corporate debtors is based on Congress's use of the word "individual." As a preliminary matter, the Court of Appeals noted that "individual" is not defined in the Bankruptcy Code. The Code does, however, define "person" in broad terms as an "individual, partnership, [or] corporation...." 11 U.S.C. § 101(35). Citing several inconsistencies within the Code, the court determined that the words "person" and "individual" are not interchangeable.[34] The Court of Appeals reasoned that in light of the Supreme Court's prescribed method of statutory construction, "individual" does not mean the same thing as "person". *In re Chateaugay*

**32.** According to the Third and Ninth Circuits: a willful violation does not require a specific intent to violate the automatic stay. Rather, the statute provides for damages upon a finding that the party knew of the automatic stay and that the party's actions which violated the stay were intentional. Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was "willful" or whether compensation should be awarded.
*In re University Medical Center*, 973 F.2d 1065 (3rd Cir.1992), *quoting In re Bloom*, 875 F.2d 224, 227 (9th Cir.1989) (citations omitted). There is ample evidence in the record that Stockschlaeder & McDonald knew of the stay and intentionally recorded the three mortgages

assignments to improve the position of the their clients.

**33.** Subsection (h) was added as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333, 352, 1984 U.S.Code Cong. & Admin.News (98 Stat.) 333, 352 (1984), to specify the sanctions to be imposed against a party found to be in willful violation of a stay under § 362. Like other courts, we have been unable to locate legislative history that explains the breadth of subsection (h).

**34.** For example, the Code allocates rights and duties to "individuals" under Chapter 13 ("individual with regular income ..."). 11 U.S.C. § 109(e).

*Corp., supra,* 920 F.2d at 184, *citing United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 1030–1031, 103 L.Ed.2d 290 (1989).[35]

We note that the Second Circuit ruling on this issue is not without its critics. Based on the broad reach of the stay provided in § 362, other Courts of Appeal have construed "individual" to mean a corporate debtor as well as an individual debtor. *See In re Atlantic Business and Community Corp.,* 901 F.2d 325 (3d Cir.1990); *Budget Service Co. v. Better Homes of Virginia,* 804 F.2d 289 (4th Cir.1986), *citing In re Tel–A–Communications Consultants,* 50 B.R. 250 (Bkrtcy.Conn.1985).

While we disagree with the result in *In re Chateaugay Corp., supra,* and its potential application, the legal reasoning is flawless. Moreover, we are bound to the holding of *In re Chateaugay Corp.* that "a bankruptcy court may impose sanctions under § 362(h) for deliberate or malicious violations of the stay, but only for violations of the stay as to debtors who are natural persons." For other (e.g., corporate or partnership) debtors, contempt proceedings are the proper means of compensation and punishment for willful violations of the stay. *In re Chateaugay Corp., supra,* 920 F.2d at 186, *citing In re Crysen/Montenay Energy Co.,* 902 F.2d 1098, 1104 (2nd Cir. 1990). *See, e.g., In re Comtek Elecs.,* 28 B.R. 829, 832 (Bkrtcy.S.D.N.Y.1983).

Although § 362(h) does not provide Trustee with a remedy, civil contempt sanctions under 11 U.S.C. § 105(a) and Rule 9020 are appropriate in this case. Our contempt authority permits the imposition of costs and reasonable attorneys' fees for malicious and bad faith violations of the stay. *In re Chateaugay Corp., supra,* 920 F.2d at 186 (citations omitted). Damages, if any, arising from Plaintiffs' willful violation of the stay will be determined at a later hearing.

**CONCLUSION**

We conclude that the bankruptcy court has authority to enter monetary sanctions against Stockschlaeder & McDonald for civil contempt and that the entry of contempt sanctions is appropriate under the circumstances of this case. We therefore grant Trustee's counterclaim for contempt in the amount of $4,070,000.00 and award Trustee $5000 in attorneys' fees.

We deny Trustee's counterclaim for compensatory and punitive damages under § 362(h) for Plaintiffs' violation of the stay because Stockbridge is a corporate debtor. We find, however, that Plaintiffs' willful violation of the stay rises to the level of contempt. Damages owed for violation of the stay and for contempt will be determined at a later hearing.

Trustee shall settle an order on five days notice consistent with this Memorandum of Decision.

**35.** "[A]s long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain meaning of the statute.... the plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of the statute will produce a result demonstrably at odds with the intention of the drafter. In such cases, the intention of the drafters, rather than the strict language, controls." *United States v. Ron Pair Enterprises, Inc., supra,* 489 U.S. 235, 109 S.Ct. 1026, 1030–31, 103 L.Ed.2d 290 (1989), *quoting Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)).