701 F.2d 1065
 LANDMARK LAND COMPANY, INC., Plaintiff-Appellee,
v.
Irvine H. SPRAGUE, William M. Isaac, John G. Heimann, James
E. Burns, Federal Deposit Insurance Corporation
and the United States of America, Defendants,
Mercantile National Bank of Chicago, Mercantile Holdings,
Inc., James R. Frankel, California Canadian Bank, as
Executor with Will Annexed of the Estate of Leonard B.
Ettelson, Deceased, Michael B. Schwartz, as Executor of the
Estate of Leonard B. Ettelson, Deceased, William P. Bright,
and Landmark Land Company, Inc., Counterclaim-Defendants,
Mercantile National Bank of Chicago and Mercantile Holdings,
Inc., Counterclaim-Defendants-Appellants.
 Nos. 10, 35, Dockets 82-7156, 82-7246.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 30, 1982.
Decided March 1, 1983.
 
 Howard G. Kristol, New York City (Robert L. Sills, William I. Sussman, Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City, of counsel), for plaintiff-appellee.
 Daniel J. Kornstein, New York City (Kornstein, Meister & Veisz, New York City, Edward J. Whalen, Flaherty & Whalen, Chicago, Ill., of counsel), for counterclaim-defendants-appellants.
 Before LUMBARD, OAKES and WINTER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 Mercantile National Bank of Chicago and Mercantile Holdings, Inc. (collectively, "Mercantile"), appeal from orders of the United States District Court for the Southern District of New York, Lee P. Gagliardi, Judge, granting plaintiff-appellee Landmark Land Company's ("Landmark") motions for partial summary judgment, 529 F.Supp. 971 (1981), and for an injunction enjoining any party from instituting or prosecuting proceedings relative to rights in a disputed note and deed of trust. We reverse.
 
 
 2
 * In 1972, the First State Bank of Northern California ("First State") loaned $300,000 to Elkee Corporation ("Elkee") and $170,000 each to Richard Curtis, Michael Whelan and James Frankel. These loans were secured by a deed of trust (the "1972 Deed of Trust") on certain California property owned by Elkee. In 1974, Elkee, along with Unique Golf Concepts, Inc., and Landmark, formed a joint venture known as La Quinta Cove for the purpose of developing the real estate (the "Cove property") owned by Elkee which included the property subject to the 1972 Deed of Trust. Elkee sold the Cove property to the joint venture in exchange for a promissory note in the amount of $1,080,000 payable to Elkee secured by a deed of trust on the La Quinta Property ("the Cove Deed of Trust"). The transfer of title was made possible by a deed of reconveyance executed by First State on May 10, 1974, which released First State's interest in the property under the 1972 Deed of Trust and stated that the loans secured by it (to Elkee, Curtis, Whelan and Frankel) had been paid. On May 15, 1974, Elkee assigned the promissory note secured by the Cove Deed of Trust ("the Cove Collateral") to First State, in the words of the assignment, to secure "the obligations of Elkee Corporation in the principal amount of $240,000." No mention was made of the Curtis, Whelan and Frankel loans which in fact had not been satisfied. First State then took possession of the Cove Collateral.
 
 
 3
 In January, 1975, Elkee assigned the Cove Collateral once again first to First State to secure its obligations, which then amounted to $280,000, and then to the Drovers National Bank of Chicago ("Drovers") to secure Elkee's indebtedness of approximately $1,161,000. Elkee subsequently repaid the $280,000 debt to First State using funds that Elkee obtained through a January, 1975, $275,000 loan from Mercantile Bank. Elkee did not, however, repay its obligation to Drovers. Finally, in March, 1976, Elkee assigned the same collateral to First State and to Mercantile to secure the loans made by First State to Curtis, Whelan and Frankel. Mercantile had previously purchased from First State 100% participation in the loans to Curtis and Whelan.
 
 
 4
 In 1976, First State was declared insolvent and the FDIC in its corporate capacity as liquidator of First State ("FDIC-First State") obtained First State's rights to the Cove Collateral, i.e., the note and Cove Deed of Trust. In 1978, Drovers was also declared insolvent and the FDIC in its corporate capacity as liquidator of Drovers ("FDIC-Drovers") obtained Drovers' rights to the same collateral. FDIC-Drovers, in turn, sold all of its rights in the Cove Collateral to Landmark after Elkee defaulted on the underlying debt owed to Drovers.
 
 
 5
 Litigation over relative rights in the Cove Collateral erupted in various fora. In May, 1977, the joint venture filed suit in Riverside County, California, against Elkee, Drovers, FDIC-First State and the Safeco Title and Insurance Company, seeking to quiet title to the Cove property and obtain possession of the Cove Collateral. In October, 1980, Mercantile intervened in that suit to assert its rights but the action was stopped when Judge Gagliardi issued a temporary restraining order enjoining all other proceedings save the instant case.
 
 
 6
 Prior to intervening in the La Quinta action, Mercantile commenced its own suit against Landmark in Riverside County, with, among others, Elkee, Unique, Curtis, Frankel, Whelan, and First State named as defendants. In May, 1980, an amended complaint was filed by Mercantile claiming in part that the defendants and others had conspired fraudulently to reconvey the 1972 Deed of Trust prior to formation of the joint venture. Mercantile alleged that an element of the conspiracy was the securing of its later loan to Elkee in early 1975.
 
 
 7
 In June, 1980, upon being informed that the FDIC intended to surrender the Cove Collateral to Landmark, Mercantile filed an action in the Northern District of California. The complaint alleged that Mercantile had been defrauded of its proper interest in the Cove Collateral by a variety of defendants, including Curtis, Whelan, Frankel, Elkee, Landmark, and Unique, in reconveying the 1972 Deed of Trust and in negotiating and obtaining Mercantile's January, 1975, loan to Elkee. In October, 1980, Elkee sued Landmark in the Northern District of Illinois for punitive damages and acquisition of a constructive trust for Landmark's alleged breach of the joint venture agreement.
 
 II
 
 8
 The complaint at hand was filed by Landmark against the FDIC in August, 1979, to obtain delivery of the Cove Collateral. Pursuant to 28 U.S.C. Sec. 1335 (1976), the FDIC filed a counterclaim for interpleader in which Landmark, Mercantile and others were named as counterclaim defendants. Mercantile crossclaimed against the counterclaim defendants to assert its claims to the Cove Collateral. Mercantile alleged, inter alia, that Landmark knew that the individual debts of Curtis, Whelan and Frankel had not been satisfied prior to First State's reconveyance of the 1972 Deed of Trust to Elkee in 1974. Mercantile requested that the court (1) declare that Elkee's 1974 assignment of the Cove Deed of Trust was substitute collateral for the individual loans, (2) declare that First State's reconveyance to Elkee was void and that the Cove Deed of Trust was a prior lien on any proceeds received by Landmark from the sale of the subject real estate, (3) declare that Elkee's $280,000 debt to Mercantile had not been discharged and that FDIC-First State in fact held the January, 1975, assignment of the Cove Deed of Trust as security for that debt, (4) order Landmark to pay the promissory note to the extent of any proceeds from the sale of the Cove real estate, and (5) impose a constructive trust on the proceeds "from the sale of real property and for any future payments to be made presently in the hands of third parties as security for the payment of the loans of Curtis, Whelan, and Elkee from Mercantile."
 
 
 9
 On August 11, 1980, twelve days after it was made a party, Mercantile made its first request for documents from Landmark. Landmark refused this request, informing Mercantile that it went far beyond their "informal" agreement. Instead, Landmark offered to deliver documents given it by the FDIC, depositions its attorneys took of FDIC officials, and "papers filed in this case."
 
 
 10
 On September 16, 1980, Judge Gagliardi extended discovery for 60 days. After Mercantile filed its answer and counterclaim, it made a formal request for documents pursuant to Fed.R.Civ.P. 34 on October 16. Landmark never responded. Instead, on the day following expiration of the 60-day period, and after the 30-day period allowed by Rule 34 to respond to Mercantile's request for documents had expired, Landmark moved for partial summary judgment declaring it the sole owner of the Cove Collateral. A stay of all the litigation described above, as well as discovery in the instant case, was granted pending determination of this motion.
 
 
 11
 Over a year later, the district court granted Landmark's motion for summary judgment. Applying the California version of the Uniform Commercial Code, Cal.Com.Code Secs. 9101-9507, the Court reasoned that the 1974 assignment of the Cove Deed of Trust was unambiguous and the parol evidence rule precluded resort to other evidence of the parties' intent. It thus concluded that the assignment was meant to secure only Elkee's indebtedness to First State (and, under the 1975 assignment, its debt to Drovers) and not the indebtedness of Curtis, Whelan, or Frankel. 529 F.Supp. at 978. In addition, the district court held that the seniority of First State's and Drovers' interest was not affected by Mercantile's later December, 1975, loan to Elkee in the amount of $275,000. Id. at 979. Once Elkee's obligation to First State was extinguished, therefore, Drovers acquired the senior interest in the collateral. Id. The 1976 assignments to Mercantile to secure the Curtis, Whelan, and Frankel indebtedness were deemed to be junior to Drovers' interest, since the latter was acquired prior to the former. Id. at 980. Finally, the district court held that the liquidation sale by FDIC-Drovers to Landmark extinguished any junior claims, ruling explicitly that the "record establishe[d] ... no genuine issue of fact with respect to Landmark's good faith in connection with the purchase of the Cove collateral from FDIC-Drovers." Id. at 981.
 
 
 12
 Three months after its award of partial summary judgment, the district court granted Landmark's motion for an injunction and enjoined
 
 
 13
 all counterclaim-defendants in this action, along with their officers, employees, servants and agents, all persons controlled by or having control of said counterclaim-defendants, and all persons acting in concert with them ... from instituting or prosecuting any proceeding in any State or United States court to the extent that such actions assert rights to the Cove note and Cove deed of trust, pending the final disposition of the case pending before this court.
 
 
 14
 Left to be tried is Landmark's claim for damages. The injunction puts on hold the two California state court proceedings filed by the joint venture and Mercantile, respectively, and the action by Elkee against Landmark in the Northern District of Illinois.
 
 III
 
 15
 We have no quarrel with Judge Gagliardi's discussion of the applicable law. We believe, however, that the record raises a material issue of fact as to Landmark's knowledge or participation in relevant events and, therefore, its status as a good faith purchaser of the Cove Collateral. Because summary judgment was granted before any significant discovery took place, we are left in much uncertainty as to the events which gave rise to this litigation. However, the parties' submission of affidavits accompanied by exhibits and of pleadings and depositions in related litigation raise sufficient doubt as to Landmark's role. The following matters in particular give us pause.
 
 
 16
 In December, 1971, Mercantile and Drovers appear to have lent certain individuals $2.8 million in order to enable them to secure control of First State. On December 1, 1972, First State made its loan of $300,000 to Elkee. Elkee was owned by one Leonard Ettelson, Drovers' general counsel and a member of its Board of Directors. One piece of correspondence in the record suggests Ettelson may at one time have had a professional relationship with First State.
 
 
 17
 Both the loan to Elkee and the $170,000 individual loans to Curtis, Whelan, and Frankel were intended to be used in the development of the Cove property. Curtis was President of a third Chicago bank which appears not to have played a role in this saga. Whelan, however, was President of Drovers, and Frankel was Ettelson's law partner, a director of Mercantile, and, during some or all of the period in question, chairman of Mercantile's loan committee. Since Curtis, Whelan and Frankel were residents of the Chicago area, these loans were outside First State's "service area."
 
 
 18
 Landmark appeared on the scene with the creation of the joint venture, known as La Quinta Cove, in May, 1974. The record rings with silence regarding the identity of the principals of Landmark. One Ernie Vossler signed documents on behalf of Landmark, but he is described only as a golf pro who went with Landmark when it purchased Unique. One Steen Weinold, self-described as a hotel manager, was a Vice-President of Elkee and also became a Vice President of Landmark at about this time. Weinold had obtained an option to purchase the La Quinta Hotel, presumably in or near the Cove property, from Ettelson in April. He assigned this to Landmark in May. Later, when the joint venture (essentially Landmark at this time) secured a default judgment against Elkee, it was Weinold who accepted service of process for Elkee.
 
 
 19
 When First State was in the process of reconveying the Cove property and extinguishing the 1972 Deed of Trust, Mr. Novacek, First State's Vice President-Loan Supervisor, telegraphed the Safeco Title and Insurance Co. that the bank would deliver the 1972 Deed of Trust along with "the note or notes secured by said trust deed." While the Deed of Reconveyance, signed by G.J. Ghiselli, a Vice President of First State, stated that it was based on "evidence that the indebtedness secured" by the Cove Deed of Trust had been "fully paid," the "note or notes secured by said Trust Deed" were apparently not delivered to Safeco, at least as far as the Curtis, Whelan and Frankel loans were concerned. They were, of course, also not satisfied.
 
 
 20
 Notwithstanding the failure of Elkee's assignment of the Cove Collateral to mention the Curtis, Whelan and Frankel loans or his own failure to send the underlying notes to Safeco, Mr. Novacek testified in other proceedings that at the time he was "under the impression" that the Cove Deed of Trust secured the Curtis, Whelan and Frankel loans. Indeed, he appears to have represented to bank examiners that the three loans were so secured.
 
 
 21
 Other such representations by First State are in the record. When First State sold 100% participation in the Curtis and Whelan loans to Mercantile, the certificate of participation for Whelan's loan recited that the security for the loan was the Cove Deed of Trust. While the certificate is dated March 24, 1975, the sale is said to have actually occurred in October, 1974.
 
 
 22
 On January 17, 1975, Elkee reassigned the Cove Note to First State as security against indebtedness in the amount of $280,000 and thereafter as further security on its debts to the Drovers. At Elkee President William Bright's behest, First State confirmed this arrangement in a letter dated February 7, 1975, which stated that the Cove Deed of Trust was to be forwarded to Drovers "upon satisfaction of all claims against Elkee." In spite of this statement, however, First State continued to represent that the Curtis, Whelan, and Frankel loans were secured by the Cove Deed of Trust. Novacek testified as to this understanding regarding the Curtis loan. As to the Whelan and Frankel loans, a number of letters written by First State officers are to the same effect. On February 20, 1975, John Stevens, of First State, in a letter transmitting Frankel's loan renewal papers, wrote that this loan "in the amount of $170,000 [is] secured by La Quinta Deed of Trust [i.e., Cove Deed of Trust]." On March 13, 1975, Stevens sent a letter to John A. Gleason, Chairman of the Board and Chief Executive Officer of Mercantile, "acknowledg[ing] that First State Bank does hold in its collateral file a Deed of Trust Note in the principal amount of $1,080,000 executed by La Quinta Cove to Elkee Corporation dated May 8, 1974, for security on [its] loan to James R. Frankel, together with an Assignment thereof." The letter also asserted that the "Note and Assignment" would be held for Mercantile's collateral interest in the loan to Mr. Frankel. In a separate letter dated the same day, Novacek transmitted the Frankel note of $170,000 to Gleason and enclosed a "receipt for collateral" stating that the Cove Deed of Trust was collateral for the Frankel note. Finally, on March 24, 1975, First State renewed Whelan's loan and issued a document entitled "Loan-Line Approval." The document stated that the Whelan loan was secured by the Cove Deed of Trust. On April 29, 1975, Stevens wrote Gleason and transmitted a photocopy of the Participation Agreement between Mercantile and First State on the Whelan loan. This was done apparently because Mercantile could not find its copy of the agreement. In any event, the letter states that First State's loan to Whelan was secured by the Cove Deed of Trust and the Participation Agreement makes the same representation.
 
 
 23
 In November, 1975, when Elkee sought the $275,000 loan from Mercantile, Frankel was chairman of the Mercantile Loan Committee. However, he abstained from voting. Under the terms of the loan, Mercantile was to be assigned the Cove Deed of Trust held by First State under the January, 1975, assignment. Elkee was to use the proceeds of the loan from Mercantile to retire its outstanding debt to First State. On December 1, 1975, Bright executed an agreement pledging the Cove Deed of Trust as collateral for the loan, and the loan was made. Through December, 1975, and January, 1976, Mercantile unsuccessfully attempted to secure the documents establishing its collateral interest on the $275,000 loan. Four calls were made in December, 1975, to Bright, who, on each occasion, gave assurances that Elkee would pay its loan to First State so that Mercantile could obtain the Cove Deed of Trust. On January 5, 1976, a loan officer at Mercantile learned from an officer at First State that First State had received the Elkee check and would be sending the Cove Deed. No deed ever arrived.
 
 
 24
 On March 4, 1976, Elkee made yet another assignment of the Cove Collateral. This assignment was supposed to secure formally the 1972 loans to Frankel, Curtis and Whelan and was made to First State and Mercantile. By the time of the assignment, the outstanding amounts on two of the loans had been reduced to $125,000.
 
 
 25
 Mercantile and Drovers appear to have suffered substantial losses, perhaps in the millions, as a consequence of defaults on loans to Ettelson or firms controlled by him and, the Curtis, Whelan and Frankel loans appear not to have been satisfied. Landmark, on the other hand, is said to have made millions on the sale of the Cove property and has even extinguished its liability on the Cove note by purchasing it from the FDIC.
 
 
 26
 We believe the allegations and supporting evidentiary materials described above amply raise a material issue of fact as to Landmark's status as a good faith purchaser of the Cove Collateral. We agree with Judge Gagliardi that Mercantile's claim that the May 15, 1974 assignment of the Cove Collateral to First State was intended to secure the Curtis, Whelan and Frankel loans must fail in view of the unambiguous nature of the contemporaneous documents. Landmark's subsequent knowledge of such a meritless claim is thus irrelevant. However, given the interrelationships of the officers and directors of the banking triangle of First State, Mercantile and Drovers, the various loans, purchases of participation and assignments of collateral back and forth among them, the possibility of self-dealing and an underlying fraudulent scheme directed at the banks cannot be excluded.
 
 
 27
 Although it is true, as Landmark's counsel emphasized at oral argument, that nothing in the record demonstrates either Landmark's participation or knowledge of such a scheme, all doubt must be resolved in favor of the party opposing a motion for summary judgment. S.E.C. v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir.1978). Moreover, discovery here was frustrated by Landmark's failure to make a timely response to requests for documents. The denial of access "to potentially favorable information" must weigh in Mercantile's favor. Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir.1980). As the record stands, Landmark Land Co., acting through strawmen, was the consistent beneficiary of a series of banking transactions which may have been part of a scheme of self-dealing and fraud. The principals of Landmark remain unknown. Its partners in the La Quinta project were in a position to influence the actions of the banking triangle, actions which not only provided financing for the La Quinta project but, by releasing the collateral for the Curtis, Whelan and Frankel loans, also substantially reduced the liens on the Cove property. In the end, Landmark sought to ride off into the sunset with the Cove property without even satisfying the promissory note to Elkee. Such good fortune, if legitimately encountered, can withstand examination.[1]
 
 
 28
 The grant of summary judgment is reversed. While the injunction relating to the other litigation between the parties was granted as an adjunct to the summary judgment, that, or a similar order, may be an appropriate means of managing the present case and finally settling the issues between the parties. Upon remand, the district court is free to continue the present injunction or modify it as it deems appropriate.
 
 
 29
 Reversed and remanded.
 
 
 
 [1]
 Mercantile admittedly failed to comply with Civil Rule 3(g) (formerly General Rule 9(g)) of the local rules of the district court by setting forth the issues of fact which it deemed to be in dispute. Landmark claims that such a failure is dispositive, citing S.E.C. v. Research Automation Corp., 585 F.2d 31, 34 n. 6 (2d Cir.1978). In that case, however, the party opposing the motion had received three extensions of time for responding and had in the end filed a single affidavit in opposition without a statement under the local rules. This case stands in a somewhat different posture, the motion having been made on the heels of Landmark's failure to make a timely response to discovery requests and Mercantile's filing of Fed.R.Civ.P. 56(f) affidavits pointing precisely to this fact as an explanation of its inability fully to respond. While a Rule 56(f) affidavit probably does not excuse a party who fails to comply with the local rules, Judge Gagliardi did not rely on the procedural failure in granting summary judgment. Given Landmark's failure to respond to the requests for discovery as required by Rule 34, we are not disposed to give it the benefit of the very rules it flouted