In re CARROUSEL MOTELS,
INC., Debtor.

Thomas C. SCOTT, Trustee, Plaintiff,

v.

The FIFTH THIRD BANK,
Third–Party Plaintiff,

and

Robert A. Harpenau, Sr. and Harpenau
Enterprises, Inc., Third–Party
Defendants.

Bankruptcy No. 1–88–00199.
Adv. No. 1–91–0087.

United States Bankruptcy Court,
S.D. Ohio, W.D.

Nov. 12, 1993.

Mark A. VanderLaan, Rita A. Miller, Cincinnati, OH, for 5/3 Bank.

Robert A. Harpenau, Sr., pro se.

## DECISION and ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

BURTON PERLMAN, Chief Judge.

This adversary proceeding is going forward on First Amended Complaint to Avoid and Recover Fraudulent and Preferential Transfers. Defendant, The Fifth Third Bank ("Fifth Third") and plaintiff trustee have filed cross-motions for summary judgment.

This court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this District. This is a core proceeding arising under 28 U.S.C. § 157(b)(2)(F) and (H).

We summarize the First Amended Complaint. It opens with a section entitled Allegations Common to All Counts. Therein, it is recited that Harpenau Enterprises, Inc. ("HEI"), merged into Harpenau Hotels, Inc. September 30, 1987. Harpenau Hotels, Inc. was the sole shareholder and owner of Carrousel Motels, Inc., the debtor (not a party to this proceeding), until about September 11, 1987, when that interest was transferred to United Liquidators, Inc. Fifth Third had a banking relationship with defendant Robert Harpenau, Sr. ("Harpenau") and several entities with which Harpenau was affiliated, including HEI and Harpenau Hotels, Inc.

It is alleged that on or about April 4, 1984, a series of five promissory notes payable to Carrousel Motels, Inc. was delivered to debtor by Kings Island Real Estate Co., a wholly-owned subsidiary of Taft Broadcasting Company ("Taft"). The amount of the notes is recited in the pleading. They replaced previous notes in similar amounts payable to debtor and delivered to debtor by Taft. Two of the notes were pledged to Fifth Third as collateral purportedly for the extension of the loan by Fifth Third to Harpenau Hotels, Inc., and a Consent to Pledge ("First Consent to Pledge") was delivered to Fifth Third by debtor as collateral. Prior to that, on December 10, 1984, Harpenau executed and delivered a promissory note to Fifth Third, and this note was renewed several times. That note, together with the renewals of it, are collectively called the "First Harpenau Note." Harpenau, on May 8, 1986, executed and delivered another promissory note to Fifth Third for which certain Kings Island notes also served as collateral. Again, this note was renewed several times, and collectively the note and renewals are referred to as the "Second Harpenau Note."

On November 6, 1985, HEI executed and delivered a promissory note to Fifth Third for which the Notes served as collateral. This note also was renewed on several occasions. The First Harpenau Note, the Second Harpenau Note, together with the HEI note and its renewals are referred to collectively as the "Harpenau Notes."

On November 12, 1985, debtor executed and delivered a Consent to Pledge ("Second Consent to Pledge"), by virtue of which several of the notes from Kings Island were pledged to Fifth Third as collateral with the extension of the loan to HEI.

About March 31, 1987, Fifth Third received a check from Taft, which Fifth Third applied in partial satisfaction of the amounts due under the Notes. About April 1, 1987, Fifth Third received another payment from Taft which was applied to satisfying the amounts due under the Notes. It is alleged that upon receipt of this amount, Fifth Third surrendered the Notes to Taft.

The counts of the complaint break down into the following distinct groups. (1) Counts 1 through 4 are based on claims of state law fraudulent conveyance with respect to the First Consent to Pledge; (2) Counts 5 through 8 are similarly based on claims relating to the Second Consent to Pledge; (3) Counts 9 through 11 assert claims of fraudulent transfer pursuant to 11 U.S.C. § 548 relating to the March 31, 1987 payment from Taft to Fifth Third (the "First Payment"); Counts 12 through 14 are based on claims of state law fraudulent conveyance relating to the First Payment; Count 15 applies 11 U.S.C. § 550 to the First Payment; (4) Counts 16 through 18 seek § 548 relief relating to the April 1, 1987 payment from Taft to Fifth Third (the "Second Payment"); Counts 19 through 21 seek state law fraudulent conveyance relief relating to the Second Payment; Count 22 applies 11 U.S.C. § 550 to the Second Payment; (5) Counts 23 and 24

deal with an alleged § 547(b) preferential transfer relating to the First Payment; (6) Counts 25 and 26 relate to alleged § 547(b) preferential transfer relating to the Second Payment; (7) Count 27 asserts conversion relating to a Third Pledge; (8) Count 28 alleges conversion relating to a Fourth Pledge; (9) Count 29 alleges conversion relating to the First Payment; and (10) Count 30 alleges conversion relating to the Second Payment.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

■ 1. Statute of Limitations. Plaintiff's amended complaint contains a series of counts which seek relief (as contemplated by 11 U.S.C. § 550(b)) for fraudulent transfer based upon state statute. Of these, defendant has selected counts 1, 2, 3, 5, 6, and 7 as the subject for a contention that these counts are barred by the Statute of Limitations. (It is not disputed that a four-year Statute of Limitations, dating from the filing of the bankruptcy case on January 20, 1988, applies.)

Some stage setting is necessary in order to make defendant's initiative regarding Statute of Limitations comprehensible. At the heart of the matter is the time when defendant acquired possession and/or an interest in certain Notes (hereafter identified as the Kings Island Notes). Confusion arises because Counts 1, 2, 3, 5, 6, and 7 all allege a transfer by a Consent to Pledge which was dated May 17, 1985, well within the Limitation period. Defendant's argument is that that transfer was meaningless, and the transfer occurred instead on December 14, 1983, when debtor conveyed to defendant its interest in an October 21, 1983 agreement between itself and Taft. It is that asserted transfer which defendant says occurred outside the Statute of Limitations and action based upon it is therefore time barred.

In opposing the motion on Statute of Limitations, plaintiff in effect says that whatever may have happened in December, 1983, there was a transfer of two of the Kings Island Notes from the debtor to defendant Fifth Third on May 17, 1985, by virtue of the Consent to Pledge which transferred the interest of debtor in Kings Island Notes 4 and 5 to Fifth Third. Each of the parties asserts that the record before us factually supports its contention.

Defendant makes it central to its argument in favor of its position that as a matter of fact defendant had possession of the five Kings Island Notes beginning in December, 1983, and this possession began the running of the Statute of Limitations. Plaintiff in opposing the motion does not agree that the record shows that defendant had possession of the Kings Island Notes beginning December, 1983. Plaintiff argues further that any transfer that occurred at that time was subsequently nullified. It was nullified, says plaintiff, because any transfer by reason of the agreement of December 14, 1983, was only for the purpose, by its terms, of collateralizing a loan in the amount of $700,000. That loan was repaid February 13, 1984. After that date, even if defendant had possession of the Kings Island Notes, such possession was not rightful. That being the case, it is the position of plaintiff that the Consent to Pledge of May 17, 1985, did in fact transfer an interest in the two Notes to which it refers so that Fifth Third could thereafter properly hold them. Defendant disagrees with plaintiff in this regard. Defendant does not dispute that the $700,000.00 loan was repaid February 13, 1984. Instead, it asserts that the Notes transferred by the agreement of December 14, 1983, collateralized not only the $700,000.00 loan to which the agreement of that date made reference, but also collateralized other loans by defendant.

In evaluating these positions, we refer to the evidence in the record before us which the parties contend supports their respective positions. We refer first to the agreement of October 21, 1983, between Kings Island Inn, debtor Carrousel Motels, Inc., and Taft. Debtor and Taft were partners in Kings Island Inn, and the purpose of the agreement was to transfer the interest of debtor in Kings Island Inn to Taft. As consideration therefore, Taft paid debtor $1,500,000.00. Payment was to be as follows (pp. 2 and 3, Bank's Ex. 1):

A. Five Hundred Fifty Thousand Dollars ($500,000) down payment payable on execution of this Agreement;

B. Nine Hundred Fifty Thousand Dollars ($950,000) face amount of promissory notes deliverable at the closing with principal payment due as follows:

    i. One Hundred Fifty Thousand Dollars ($150,000) principal amount payable April 1, 1987;

    ii. One Hundred Fifty Thousand Dollars ($150,000) principal amount payable April 1, 1988;

    iii. One Hundred Fifth Thousand Dollars ($150,000) principal amount payable April. 1, 1989;

    iv. One Hundred Fifty Thousand Dollars ($150,000) principal amount payable April 1, 1990; and

    v. Three Hundred Fifty Thousand Dollars ($350,000) principal amount payable April 1, 1991.

Interest shall be payable semi-annually in arrears on October 1 and April 1 of each year and with such interest to be paid with respect to each month at the prime rate in effect on the first business day of such month at the Bank of New York, provided that in the event such prime rate is more than ten percent (10%) the rate on such notes for the particular month shall be ten percent (10%).

It is these five notes to which we have been and will be referring as the "Kings Island Notes."

The agreement provided that there was to be a closing of the agreement on April 2, 1984, and further expressly provided at ¶ 8A that at the closing Taft was to deliver five promissory notes payable to Carrousel as described in the quoted language above. (We note that, in the agreement itself, Taft was to pay the purchase price to Kings Island Inn, and was to deliver the five promissory notes to Kings Island Inn, but clearly it was the intention of the parties that this effectively be a transfer to Carrousel Motels, Inc., for at ¶ 2 it is provided that the "purchase price shall be allocable by Kings solely to the account of Carrousel...." In addition, Amendment to Agreement dated January 30, 1984, executed by Taft and debtor provided that in the event the transaction that was the subject of the October 21, 1983 agreement was not closed on April 4, 1984, then debtor, Carrousel Motels, Inc., was to repay Taft the $550,000.00.)

The next documentary evidence is an agreement dated December 14, 1983, between debtor, referred to in the agreement as "Carrousel", defendant, referred to in the agreement as "Bank", and Robert H. Harpenau, Sr., referred to in the agreement as "Harpenau". The subject of that agreement is the five Kings Island Notes. The agreement makes express reference to the fact that Bank has agreed to lend $700,000.00 to Harpenau Enterprises, Inc. The pertinent portion of the agreement language for present purposes is the following:

    1. Carrousel agrees to assign its interest in the Agreement, dated October 21, 1983, to Bank, including payment of principal on the $700,000 note, in accordance with the terms of the Taft Notes to it.

The December 14, 1983, agreement contains other provisions not here relevant.

Another document in the record before us is one also dated December 14, 1983. This one is simply entitled ASSIGNMENT. It provides in its entirety:

    We hereby assign our interest in the attached Agreement to the Fifth Third Bank until the balance of principal on a certain note from Harpenau Enterprises, Inc. to the Fifth Third Bank of SEVEN HUNDRED THOUSAND ($700,000) DOLLARS has been paid in full.

This instrument is signed Carrousel Motels, Inc. by Robert H. Harpenau, Sr.

To the extent that defendant's motion depends upon possession of the Kings Island Notes beginning on or about December 14, 1983, the motion must fail, for no evidence supports the fact of possession on that date. While defendant asserts repeatedly that the evidence shows that defendant had possession of the Kings Island Notes beginning December 14, 1983, the documentary evidence is inconsistent with that assertion. The October 21, 1983 agreement says that the Kings Island Notes would not be deliv-

**998**

ered until the closing, April 2, 1984, so that the documentary evidence contradicts defendant's assertion. The evidence which defendant says is supportive of its position of earlier possession is a letter from George A. Schaefer, Jr., a group vice president of Fifth Third dated December 15, 1983, to William H. Troutman, president of HEI. While that letter makes reference to the fact that the $700,000.00 note to HEI is secured "with the $950,000.00 in promissory notes of Taft as outlined on the face of the note," there is nothing whatsoever in that letter evidencing possession of the Notes by defendant at the time of the letter. It is also significant that defendant presents no evidence by its own personnel of possession of the Notes beginning December 14, 1983.

■ We can best deal with the remaining arguments of the parties as to the Statute of Limitations by assuming arguendo that sufficient interest was conveyed December 14, 1983, to start the running of the Statute of Limitations. Plaintiff argues that whatever interest in the Notes was transferred December 14, 1983, that interest terminated February 14, 1984, because the interest in the Notes was given to collateralize the $700,000.00 loan to HEI, and that loan was paid off February 13, 1984. Plaintiff's expert in his affidavit (Ex. J, p. 5) expressly states that this is so. Defendant does not deny this fact, but argues against its impact by asserting that the evidence shows that the interest in the Kings Island Notes was given to defendant to collateralize not only the $700,000.00 loan, but all loans outstanding to Harpenau and his various enterprises. To support this position, defendant relies upon the affidavits of Troutman and Harpenau, which do indeed say that it was the intention that loans other than the $700,000.00 be collateralized by that transfer. These statements, however, directly contradict the express language of the documents executed on December 14, 1983. The language of those documents being unambiguous, consideration of defendant's affidavit evidence is barred by the parol evidence rule. *Aultman Hosp. Ass'n v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 54, 544 N.E.2d 920, 923 (1989). A mere statement of intention in any case could hardly withstand an attack by creditors of

the debtor based upon a properly executed agreement which on its face stated otherwise.

■ We conclude, as urged by plaintiff, that the Consent to Pledge did transfer an interest in Kings Island Notes 4 and 5 from debtor to defendant. The $700,000.00 loan originally collateralized by the Notes was repaid to defendant on February 13, 1984. Upon payment of the only obligation secured by the December 14, 1983 assignment, the security interest terminated as between debtor and Fifth Third. *Rozen v. North Carolina Nat'l Bank*, 588 F.2d 83, 86 (4th Cir.1978); *Bank of Lexington v. Jack Adams Aircraft Sales, Inc.*, 570 F.2d 1220, 1225 (5th Cir.1978); *see also Landmark Land Co. v. Sprague*, 529 F.Supp. 971 (S.D.N.Y.1981), *rev'd on other grounds*, 701 F.2d 1065 (2d Cir.1983) (security interest in note perfected by possession extinguished upon payment in full of underlying secured obligation, notwithstanding continued possession of note by former secured party). The security interest no longer attached due to the lack of any then present value having been given by Fifth Third. *See* Ohio Rev.Code Ann. § 1309.14 (Baldwin 1988). We hold that plaintiff's position is correct and the Consent to Pledge of May 17, 1985, did transfer an interest in Kings Island Notes 4 and 5 to defendant. We add to plaintiff's argument in this regard only that it scarcely lies for defendant to argue that the Consent to Pledge was a meaningless act when the document itself is executed on a Fifth Third form.

In light of the foregoing discussion we hold that defendant's motion for summary judgment to the extent that it is based on the Statute of Limitations, must be denied.

■ 2. Actual Intent. The second part of defendant's motion for summary judgment is directed at counts 2, 6, 9, 13, 16, and 20 of the First Amended Complaint which are based upon the trustee's power to avoid transfers accomplished with actual intent to hinder, delay or defraud creditors pursuant to O.R.C. § 1336.07 and 11 U.S.C. § 548(a)(1). Essentially, defendant says that it is entitled to summary judgment on this point because, it says, the affidavits of Harpenau and of Troutman say that it was Har-

penau's intention that creditors be paid in full. Defendant says that there is no contrary evidence. Plaintiff responds that fraudulent intent may be inferred from circumstantial evidence, and he marshals circumstantial evidence sufficient to persuade the court that there is at least a genuine issue of material fact on this point, so that defendant's motion in this regard must be denied.

■ 3. Reasonably Equivalent Value. For the third ground in its motion for summary judgment, defendant says that counts 10, 11, 12, 14, 17, 18, 19 and 21 should be dismissed because debtor received fair consideration and reasonably equivalent value in exchange for the first and second payments. The "payments" referred to are those from Taft to defendant. There were two such payments. The first was on or about March 31, 1987, when defendant received a check in the amount of $186,020.83 from Taft (the "First Payment") of which $150,000.00 was applied to payment on the principal of loans made to the Harpenau Group. (Defendant defines Harpenau Group as a number of entities controlled by Harpenau which included, but was not limited to, debtor, HEI, Brown County Inn, Harpenau Hotels, Inc., Harpenau Hotel Associates, and Queen City Racquet Club. Defendant says that, at least on December 14, 1983, defendant had $2,936,-000.00 in outstanding loans to various members of the Harpenau Group.) On or about April 1, 1987, defendant received a second check in the amount of $800,000.00 from Taft (the "Second Payment"). Harpenau directed defendant to apply that fund to the remaining unpaid balance on the Harpenau Group loans. Defendant then surrendered the Kings Island Notes to Taft at the direction of Harpenau. The thrust of this branch of defendant's motion for summary judgment is that a debtor can receive fair consideration even though the consideration goes to a third person instead of to the debtor.

A primary authority on the subject of fair consideration is *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979 (2d Cir. 1981). The case does indeed stand for the proposition urged by movant, that fair consideration to a debtor can be received even though the benefit flows to a third party. The *Rubin* court, however, applies limitations to the general proposition. The court in *Rubin* was interpreting § 67(d)(1)(e) of the Bankruptcy Act of 1898. The remarks of the court in *Rubin* provide valid precedent for a like consideration arising under the Bankruptcy Code at § 548(a)(2). The court in *Rubin* said at pp. 991 and 992:

> The cases recognize, however, that a debtor may sometimes receive "fair" consideration even though the consideration given for his property or obligation goes initially to a third person. As we have recently stated, although "transfers *solely* for the benefit of third parties do not furnish fair consideration" under § 67(d)(1)(e), the transaction's benefit to the debtor "need not be direct; it may come indirectly through benefit to a third person." *Klein v. Tabatchnick*, 610 F.2d 1043, 1047 (2d Cir.1979) (emphasis added). Accord, *Williams v. Twin City Co.*, 251 F.2d 678, 681 (9th Cir.1958); *McNellis v. Raymond*, 287 F.Supp. 232, 238–39 (N.D.N.Y.1968), *aff'd in relevant part*, 420 F.2d 51 (2d Cir.1970). If the consideration given to the third person has ultimately landed in the debtor's hands, or if the giving of the consideration to the third person otherwise confers an economic benefit upon the debtor, then the debtor's net worth has been preserved, and § 67(d) has been satisfied—provided, of course, that the value of the benefit received by the debtor approximates the value of the property or obligation he has given up. For example, fair consideration has been found for an individual debtor's repayment of loans made to a corporation, where the corporation had served merely as a conduit for transferring the loan proceeds to him.

And, at p. 993:

> ... In a three-sided transaction such as that presented here, it is not enough merely to compare the absolute amount of the third person's debt with the amount of security given by the bankrupt. The trustee, who has the burden of proving that the transaction was "without fair consideration," see 4 Collier on Bankruptcy, *supra*, ¶ 67.43, at 620–21 (citing cases),

could establish lack of fair consideration under § 67(d) by proving that the value of what the *bankrupt* actually received was disproportionately small compared to the value of what it gave. Accordingly, the court must attempt to measure the economic benefit, if any, that accrued to each bankrupt as a result of the third person's indebtedness, and it must then determine whether that benefit was "disproportionately small" when compared to the size of the security that that bankrupt gave and the obligations that it incurred.

To meet the burden imposed on it by the statements of the law, defendant in its memorandum in support of its motion for summary judgment says at pp. 15–17:

> In the present case, CMI benefitted from the entire transaction relating to the pledge of the Notes and cash surrender thereof, referred to by the trustee as the First and Second Payments. As set forth above, the Harpenau Group loans had a total value of $950,000. This sum related to two loans in the name of Harpenau, Sr. and one loan in the name of HEI. Fifth Third extended the loan in HEI's name on or about November 12, 1985 in the principal amount of $450,000. Harpenau, Sr. put those funds back in the Harpenau Group with the majority of the funds going to CMI. In effect, Harpenau, Sr. caused the funds to be loaned to CMI in order to keep the motel operating through the winter months when revenues traditionally fell and did not meet its ordinary operating expenses. Affidavit R.A. Harpenau, Sr. ¶¶ 4, 5 (Exhibit 4).

> Similarly, Harpenau, Sr. did not keep the proceeds of either of the two remaining loans for his personal use. These loans were obtained by him for the purpose of funding his business operations. The $100,000 loan in Harpenau, Sr.'s name, made on May 8, 1986, ultimately landed in the hands of CMI. Harpenau, Sr. personally loaned most, if not all, of those funds to CMI because it was experiencing economic difficulties and required significant infusions of cash during this period of time. Affidavit R.A. Harpenau, Sr. ¶ 6 (Exhibit 4).

> In the same way, Harpenau, Sr. used the funds represented by the $400,000 loan balance to keep CMI and others in the Harpenau Group operating during financially difficult times. Affidavit R.A. Harpenau, Sr. ¶ 6 (Exhibit 4). CMI benefitted directly from all monies received from Harpenau, Sr. as a result of this loan. CMI also received tangible benefits by the cash infusions made to its parent and sister companies. For the reasons more fully set forth in section H herein, CMI and the other Harpenau Group entities were the alter ego of Harpenau, Sr., i.e., they were so situated as to have an identity of interest. Thus, a loan from Harpenau, Sr. to any of the entities to maintain its financial strength or ongoing operations indirectly reaped intangible benefits for CMI. Having received, indirectly, both tangible and intangible benefits from the Fifth Third loans, CMI clearly received reasonably equivalent value for the pledge of the Notes for that indebtedness.

> CMI also received direct benefit form the so-called First and Second Payments. The payments relieved HEI and Harpenau, Sr. from the responsibility of repaying the loans to Fifth Third, and at the same time relieved CMI from having to repay the loans back to Harpenau, Sr. and HEI. Affidavit R.A. Harpenau, Sr. ¶ 7 (Exhibit 4). Relief from payment clearly conferred substantial economic benefit upon CMI that was both direct and tangible. As such, it received reasonably equivalent value in exchange for the First and Second Payments and the payments cannot be avoided as fraudulent transfers pursuant to Section 548(a)(2). For these same reasons, CMI received fair consideration for the First and Second Payments, and they can not be voided under O.R.C. §§ 1336.04 and 1336.05. Hence, Fifth Third is entitled to summary judgment as to Counts 10, 11, 12, 13, 17, 18, 19, and 21 as a matter of law.

Plaintiff in this proceeding, trustee in the related bankruptcy case, obviously was not a player in the events under examination here. To investigate the affairs of the debtor, plaintiff employed an accountant, Gerald Von

Deylen. Von Deylen spent considerable time reviewing the financial affairs of the debtor. Plaintiff presents an affidavit of Von Deylen in opposition to defendant's motion for summary judgment. There, Von Deylen says, ¶ 11, at p. 6:

> Based on my review and analysis of the documents retrieved from the files of Fifth Third, Rippe and Kingston, and the Harpenau Group companies, none of the proceeds of the Harpenau Group loans retired upon payment of the Notes were used by Carrousel.

In addition, the file contains a deposition of Von Deylen taken by defendant.

The testimony of Von Deylen is directly contrary to that of Harpenau, whose affidavit defendant relies upon entirely to support the assertions which we have quoted above. There is a genuine issue of material fact as to whether the debtor received fair consideration or reasonably equivalent value in connection with the transaction when defendant received payment from Taft in exchange for the Kings Island Notes, property of debtor.

We comment on the argument of defendant on the present point that the court, as apparently did Harpenau, should ignore the inconvenient fact that the debtor was a corporation. We see no reason which would justify the court in accepting that position. We address this question more fully hereafter.

The record before us fails to establish the absence of a genuine issue of material fact that the quantifiable economic benefit to the debtor required by *Rubin* was bestowed. Defendant's motion for summary judgment on grounds that there was reasonably equivalent value for the payments to defendant must be denied.

■ 4. **Fair Consideration for Pledge of Notes.** In this portion of its motion, defendant attacks counts 3 and 7 of the complaint. Count 3 of the complaint is based upon former O.R.C. § 1336.05, and alleges that the transfer of the Kings Island Notes to defendant was without fair consideration, and left debtor with property constituting an unreasonably small capital. The count ends also with a reference to 11 U.S.C. § 544(b).

Count 7 states that it is based upon O.R.C. § 1336.05(A) and § 1336.07, and refers as well to 11 U.S.C. § 544(b). It contends that debtor did not receive reasonably equivalent value upon the transfer of the notes, and either was insolvent or was rendered insolvent by that transaction.

In dealing with counts 3 and 7, defendant argues that debtor benefitted from the $700,000.00 loan made by defendant to HEI at the time of the transfer of the Kings Island Notes to defendant. Defendant refers to the affidavit of W.H. Troutman, ¶ 11, to support this proposition.

Suffice it to say that the proposition requires that the quantifiable benefit test discussed in the preceding section of this decision must here be met. All that Troutman says is that the $700,000.00 loan was used "in large part to pay various debts" of debtor.

Defendant's motion fails this test and must be denied on this branch.

■ 5. **Alter Ego.** Defendant groups counts 23 and 25 in its motion, raising the question of solvency of the debtor at the pertinent time period. In counts 23 and 25 of the First Amended Complaint, plaintiff alleges that the First Payment (that made by Taft to defendant in the amount of $186,020.83 on March 31, 1987) and the Second Payment (that made by Taft to defendant in the amount of $800,000.00 on April 1, 1987), are voidable as preferential transfers under 11 U.S.C. § 547(b). Defendant asserts that the question of whether the debtor was insolvent when the payments were made must be considered in connection with the financial health of all of the entities in the Harpenau Group. Defendant then embarks upon a discussion of the application of the doctrine of alter ego to the present case. In this portion of its motion, defendant says that debtor was the alter ego of Harpenau. Implicit in defendant's argument is a further contention that all of the Harpenau enterprises were alter egos of Harpenau, and that the total financial condition of all of those entities, including debtor, must be considered in deciding the question of the insolvency requirement under 11 U.S.C. § 547(b). Defendant goes into considerable detail in eliciting from cases in

the area the circumstances under which a corporate entity will be disregarded, and plaintiff responds in kind. Defendant also attacks counts 27, 28, 29, and 30, which allege conversion, upon the same alter ego contentions.

■ This court is of the opinion that such a debate has no place in the circumstances of the present case. The alter ego doctrine may not be used for the purpose sought by defendant. A useful statement is:

> Basic to the theory of corporation law is the concept that a corporation is a separate entity, a legal being having an existence separate and distinct from that of its owners. This attribute of the separate corporate personality enables the corporation's stockholders to limit their personal liability to the extent of their investment. But the corporate device cannot in all cases insulate the owners from personal liability. Hence, courts do not hesitate to ignore the corporate form in those cases where the corporate device has been misused by its owners. The corporate form, however, is not lightly disregarded, since limited liability is one of the principal purposes for which the law has created the corporation.

*Krivo Indus. Supply Co. v. National Distillers & Chem. Corp.*, 483 F.2d 1098 (5th Cir. 1973).

By this language the *Krivo* court gives the basic rationale for the alter ego doctrine: because a purpose of the corporate form is limitation of liability, a court should disregard that form and impose liability on the sheltered entity when recognition of corporateness would be unjust. The alter ego doctrine, then, is a sword.

■ Bearing in mind its rationale, the alter ego doctrine by its nature does not admit of mutuality; the doctrine may not be used as a shield. That is, one may not disregard corporateness unless there has been misuse of corporateness. There is no such contention here, and the doctrine of alter ego is not available to defendant as a defense. It simply does not lie in the hand of the one who adopted the corporate form with its attendant benefits and consequences, or a party whose rights derive from that one, now to ask that that form be disregarded. On its face that would be unjust.

Defendant's defense that the corporate form should be disregarded because that is how it was treated by a controlling individual certainly is impermissible in a case such as this where debtor corporation was a distinct operating entity that had generated a body of creditors in its operations. The trustee, plaintiff here, stands in the shoes of creditors. It is unthinkable that the claim of a creditor of this corporation should have its claim defeated by a contention that the assets of the corporation did not really belong to the corporation, but were only part of a larger enterprise.

Defendant's alter ego argument is unsound and its motion to the extent it is so based will be denied.

■ 6. Preference. Counts 23 and 25 allege preferential transfer pursuant to 11 U.S.C. § 547(b) relating to the First and Second Payments, which, it will be recalled, were made by Taft to defendant. The allegation in both counts is that Harpenau and/or HEI were creditors of the debtor, and the respective payments were made to or for the benefit of Harpenau and/or HEI. The remaining necessary requirements for preference are then set forth in each of the counts. Defendant attacks the counts on the grounds that they are time barred because Harpenau and HEI are not "insiders" with respect to the debtor. Defendant's contention relates only to HEI. It says that HEI is not an insider of the debtor so that the one-year preference period of § 547(b)(4)(B) is inapplicable. Defendant says that HEI cannot be regarded as an insider because it did not own, control, or hold voting securities of the debtor, nor was there any applicable lease or operating agreement. It is to be noted that defendant merely makes this assertion; it offers no evidentiary support. Not to be outdone, plaintiff responds, without reference to evidence, that HEI is "an affiliate" of debtor, for both companies were solely controlled by Harpenau Hotels, Inc., which is controlled in turn by Harpenau, and that this is sufficient to warrant the classification of HEI as an insider.

On what the parties have proffered in connection with this aspect of the motion for summary judgment, the court would be unjustified in reaching the conclusion that there is no genuine issue of material fact, and therefore the motion for summary judgment on the issue of preference must be denied.

## PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

■ On his cross-motion for summary judgment, plaintiff asserts that he is entitled to summary judgment on the conversion counts of the complaint because defendant has offered no valid defenses thereto.

Count 27 of the First Amended Complaint is entitled Conversion Relating to the Third Pledge. In that count, plaintiff is making reference to a transaction that occurred on December 10, 1984, when Harpenau gave defendant a promissory note in the amount of $556,364.73 (defendant's note # 00067). That promissory note was renewed on a number of occasions and the original note, together with the renewals, are referred to in the complaint as the "First Harpenau Note". It is alleged that the Kings Island Notes served as collateral for that transaction. The core of count 27 is that debtor did not authorize the December 10, 1984 transaction, so that its execution constituted a conversion of debtor's rights in the notes.

Count 28 refers to a transaction that occurred on May 8, 1986, when Harpenau executed and delivered a promissory note in the principal amount of $100,000.00 to defendant. This note, together with renewals, are referred to as the "Second Harpenau Note". Again, the core of count 28 is that debtor did not authorize the transaction, and the transfer of the interest in the Notes as collateral constituted a conversion.

Count 29 is entitled Conversion Relating to the First Payment. The First Payment is that said to have occurred March 31, 1987, when defendant received a check in the amount of approximately $186,020.83 from Taft. In count 29, plaintiff says that because debtor did not authorize the First Payment, a conversion occurred.

Count 30 is entitled Conversion Relating to the Second Payment. The Second Payment is that said to have occurred on or about April 1, 1987, when defendant received $800,-000.00 from Taft, whereupon defendant surrendered the Notes to Taft. In count 30, plaintiff says that the transaction was not authorized and therefore a conversion of the property of the debtor occurred.

■ Though in his complaint, plaintiff in regard to counts 27 and 28 refers specifically to transactions which occurred December 10, 1984 and May 8, 1986, his argument for summary judgment in connection with those two counts makes reference to the Consents to Pledge dated May 17, 1985 and November 12, 1985. The evidence to which plaintiff refers in this connection (p. 41, plaintiff's memorandum in chief) to support his motion refers to testimony relating to the Consents to Pledge. The disparity between the transactions alleged in counts 27 and 28 and those argued about by plaintiff leaves the court unable to address plaintiff's motion in this respect. So far as counts 29 and 30 are concerned, those alleging conversion by reason of the payments received by defendant from Taft in exchange for which the Notes were surrendered to Taft, plaintiff's position on its cross-motion for summary judgment is equally opaque. It seems that the backbone of plaintiff's argument in respect to seeking summary judgment on all four of these counts is its statement that "Robert Harpenau, Sr. was *not* Carrousel." Absent from what is presented to the court, however, is evidence negativing the possibility that Harpenau may have been an agent duly authorized by debtor to act in its behalf. Plaintiff, on his cross-motion for summary judgment, of course, has the burden of proof of establishing his contentions. He cannot rest merely upon the fact that defendant has failed to offer evidence contrary to the allegations of the complaint.

As indicated in what we have written in connection with defendant's motion for summary judgment, in all respects other than the conversion counts, we have found genuine issues of fact which preclude the granting of summary judgment to defendant. That finding cuts both ways, and as to the other

counts, plaintiff's cross-motion must likewise be denied.

In concluding his cross-motion for summary judgment, plaintiff requests that this court make what amount to findings of fact on the record before us. No citation of authority is needed for the court to respond that that request is wholly inappropriate. Courts are not to resolve issues of fact on motions for summary judgment. The request is denied.

\*       \*       \*

The motion for summary judgment of defendant The Fifth Third Bank and the cross-motion for summary judgment of plaintiff trustee are denied.

So Ordered.